623 P.2d 110
**STATE of Idaho, Plaintiff-Respondent,**

v.

**Carlos GOMEZ, Defendant-Appellant.**

**No. 12820.**

Supreme Court of Idaho.

Dec. 9, 1980.

Rehearing Denied Feb. 23, 1981.

**804**

Wayne P. Fuller, Caldwell, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Myrna A. I. Stahman, Deputy Attys. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

Defendant Gomez was charged with possession of marijuana and possession of heroin with intent to deliver. A jury found him guilty as charged. Gomez appeals that conviction, claiming that: (1) certain evidence seized by law enforcement officers in a search of his premises should have been suppressed; (2) the trial court erred in limiting defendant's right to cross examine a police officer at the suppression hearing; (3) he was denied due process by virtue of the state's failure to disclose before trial certain photographs material to the search and seizure issue; (4) the trial court erred in permitting a federal narcotics agent to give his opinion regarding defendant's alleged intent to deliver the narcotics seized; and (5) the evidence was insufficient to support the jury's finding that the defendant intended to deliver narcotics.

On May 18, 1976, Lt. Galland, director of the city-county narcotics division of Canyon County, submitted an "Affidavit in Support of Search Warrant" to a magistrate. The magistrate then issued a search warrant directing "ANY SHERIFF, CONSTABLE, MARSHAL OR POLICEMAN" in Canyon County to search defendant's residence described as:

> "That certain single-story white frame house located at Route 3, Parma, Idaho, on a road known as Highway 18 or Roswell Boulevard, and particularly located in the middle of a block on the east side of the highway between Wendell Street and Park Street and identified with the number 204 posted on the front of the house under the possession and control of one Carlos Gomez."

After warrants for the arrest of Gomez and a search of his home were issued, a number of officers met in the basement of the Canyon County sheriff's office in order to determine how to proceed to execute the warrants. Agent Johnson, a special agent for the State Bureau of Narcotics, testified that at such time he personally observed what he thought were the original arrest and search warrants. Whether or not he had actually seen them, it is certain that he was aware that the warrant for the arrest of Gomez and the warrant to search the defendant's premises had been issued.

Thereafter, a number of officers proceeded toward the city of Parma in several cars. Lt. Galland had possession of the arrest and search warrants. Agent Johnson and Officer Galland were in separate vehicles. When the officers arrived in Parma, Lt. Galland proceeded to arrest the defendant

at a location not far from defendant's residence. At this time, Agent Johnson was radioed and informed that Gomez was being arrested, and that he should proceed to the Gomez residence in order to "secure the premises." According to Agent Johnson, the officers desired to make sure that no one entered or left the premises and that no evidence would be destroyed.

Agent Johnson and two other officers proceeded to the defendant's house without the warrant, knocked on the door, identified themselves and their purpose, and, having heard no reply, proceeded to enter the house through both the back and front doors. Upon entering the residence, they found defendant's wife and a child. They looked through the rooms and closets of the house in order to ascertain the presence of any other people. They found no one. They did not search for or seize any evidence at that time.

Approximately ten to fifteen minutes later, Lt. Galland arrived at the premises with the search warrant. Thereafter, officers conducted a thorough search of the premises and found: two bags of marijuana; twelve tinfoil packets of 8–14% heroin; a bag containing 15 grams of 17% heroin; a "fix kit" containing syringe and rubber hose; and a scale.

Prior to trial, defendant had made a motion to suppress the evidence of the search on the grounds raised here on appeal. As new evidence became available, this motion was renewed several times, before and during trial, and was denied each time by the trial court.

## I

### THE SUPPRESSION ISSUE

Defendant asserts three independent grounds in support of his contention that the court below erred in denying his motion to suppress. First, he maintains that the affidavit offered in support of the search warrant was insufficient to demonstrate probable cause. Secondly, he argues that the actions of the three officers in "securing the premises" prior to the arrival of the

search warrant was unlawful. Thirdly, defendant insists that the description of his residence in the affidavit and search warrant was insufficient in that it did not particularly describe the premises to be searched. We will address these issues separately.

A. Sufficiency of the affidavit in support of the search warrant.

■ We note at the outset the somewhat deferential standard of appellate review used to test the sufficiency of affidavits in support of search warrants. Affidavits for search warrants should not be reviewed and tested in a hypertechnical manner. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *State v. Oropeza*, 97 Idaho 387, 545 P.2d 475 (1976). A magistrate's determination of probable cause should be accorded great deference by the appellate court. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *State v. Oropeza, supra.* Similarly, such affidavits should be tested by standards less rigorous than those governing the admissibility of evidence at trial. *Spinelli v. United States, supra.*

Keeping the above standards of appellate scrutiny in mind, we turn now to the sufficiency of the affidavit in question. The affidavit, signed by Lt. Galland, was based primarily on two sources of information: a confidential informant and prior surveillances of the defendant conducted by law enforcement officers. The officers had observed Gomez making heroin deliveries in the Boise area on two separate occasions, thirty-nine and forty-five days prior to the issuance of the warrant. On the day before the warrant was issued, the confidential informant had told Lt. Galland that quantities of narcotics could be found at the Gomez residence.

The defendant argues that the information provided by the confidential informant does not meet the two-pronged test articulated by the United States Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); further explicated in *Spinelli v. United States, supra,,* and implemented by this Court in *State v.*

*Oropeza, supra,* and *State v. Alger,* 100 Idaho 675, 603 P.2d 1009 (1979). The requirements of the test are as follows:

> "Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable'." *Aguilar v. Texas,* 378 U.S. at 114, 84 S.Ct. at 1514, 12 L.Ed.2d at 729 (citations omitted).[1]

■■ Regarding the informant's tip in the instant case, it is quite clear that the affidavit met the second prong of the *Aguilar-Spinelli* test, the so-called "veracity prong." The affidavit states that the confidential informant had proven reliable on no less than six previous occasions, and his information had directly led to the arrest and prosecution of at least five traffickers of narcotics. The affidavit amply demonstrates the informant's reliability. *See, e.g., Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). We also note that "[a] particularly strong showing on one prong may compensate for a weaker showing on the other." *United States v. Smith,* 598 F.2d 936, 939–40 (5th Cir. 1979).

■ However, the informant's tip does not meet the first prong of the *Aguilar-Spinelli* test, dubbed the "basis of knowledge" prong. The affiant, Lt. Galland, states that the tipster informed him that "Carlos Gomez had delivered a quantity of heroin through a third party to two subjects from the Burley, Idaho, area; one of those subjects being a female by the name of Janie Ramos and another male subject known as Pete Guzman." The affidavit does not indicate whether the confidential informant observed the delivery firsthand.[2] Nor does it indicate how it was known that the "third party" had acquired the heroin from Gomez. Not only does the affidavit raise the problematic aspect of hearsay, but also hearsay upon hearsay. *See State v. Oropeza, supra.*

The state admits as much when it states in its brief: "There is no indication in the affidavit . . . as to whether the information provided by the confidential informant was based upon the informant's observation of Carlos Gomez delivering drugs to a third party who subsequently delivered them to Janie Ramos and Pete Guzman." Therefore, if the affidavit in question were based solely on the anonymous informant's tip, we would be compelled to hold the search warrant invalid. The tip, by itself, does not meet the *Aguilar* test, since it lacks the primary factual data required for the magistrate to evaluate the conclusional validity of the informant's statements. *See Stanley v. State,* 19 Md.App. 507, 313 A.2d 847, 861 (1974), *cert. denied* (1974).

The state insists that this defect is not fatal to the affidavit, pointing out that probable cause here is based not only on the informant's tip, but also on the affiant's independent knowledge of defendant's "recent" narcotics trafficking as observed by other law enforcement officers. The state's argument is roughly based on the following language from *Spinelli:* "If the tip is found inadequate under *Aguilar,* the other allegations which corroborate the information contained in the hearsay report should then be considered." *Spinelli v. United States,* 393 U.S. at 415, 89 S.Ct. at 588, 21 L.Ed.2d at 643.

---

1. The *Aguilar-Spinelli* test is substantially codified in I.C.R. 41(c), which reads in relevant part as follows: "The finding of probable cause shall be based upon substantial evidence, which may be hearsay in whole or in part, provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is factual basis for the information furnished."

2. The *Aguilar-Spinelli* inquiry places a premium on the informant's personal observation or firsthand knowledge. *See State v. Alger,* 100 Idaho 675, 603 P.2d 1009 (1979); *State v. Archer,* 23 Ariz.App. 584, 534 P.2d 1083 (1975); *State v. Lemons,* 21 Ariz.App. 316, 519 P.2d 69 (1974); *State v. Weinberg,* 364 So.2d 964 (La. 1978); *Laster v. State,* 60 Wis.2d 525, 211 N.W.2d 13 (Wis. 1973); 1 W. LaFave, Search & Seizure, A Treatise on the Fourth Amendment, § 3.3(d) (1978).

As noted by Judge Friendly, writing for the 2nd Circuit Court of Appeals, the effect of a defect in the informant's tip is diminished when the affidavit presents other independently incriminating information:[3]

"The lesson we draw from all this is that *Aguilar* applies with full rigor only when the search warrant or the arrest depends solely on the informer's tip. When a tip not meeting the *Aguilar* test has generated police investigation and this has developed sufficient corroboration or other '*probative indications of criminal activity* along the lines suggested by the informant,' see Rebell, The Undisclosed Informant and the Fourth Amendment: A Search for Meaningful Standards, 81 Yale L.J. 703, 715–17 (1972), the tip, even though not qualifying under *Aguilar*, may be used to give such additional color as is needed to elevate the information acquired by police observation above the floor required for probable cause." *United States v. Canieso*, 470 F.2d 1224, 1231 (2d Cir. 1972) (emphasis in text).

 In the instant case, the affidavit of Lt. Galland sets forth "other probative indications of criminal activity." The affidavit alleges that on two separate occasions the defendant made deliveries of heroin while under surveillance by investigative officers. Police officers are presumed to be reliable sources of information. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *State v. Alger*, 100 Idaho 675, 603 P.2d 1009 (1979). The police officers personally observed criminal activity. Under these circumstances, the issue is not really whether these observations sufficiently corroborate the informant's tip, but rather whether the criminal activity previously observed by the police officers, supported by the *Aguilar*-defective informant's tip can support a magistrate's finding of probable cause.[4] *See United States v. McNally*, 473 F.2d 934, 939–40 (3rd Cir. 1973) (while recognizing that the "tip plus corroboration" approach is fruitless where the informant's tip sets forth no detail capable of corroboration, the court nonetheless held that "other independently suspect activity" can together with defective tip establish probable cause).

In a recent case, *State v. Alger, supra*, this Court recognized that direct observations made by police can be combined with an informant's tip to constitute probable cause, even though the police observation by itself would be insufficient.

" '[D]irect observations, insufficient unto themselves to establish probable cause, may nevertheless be added to trustworthy hearsay, which . . . is also insufficient unto itself, so that the combination of incriminatory elements may establish the probable cause which neither alone quite demonstrates.' Moylan, Hearsay and Probable Cause: An *Aguilar* and *Spinelli*

---

**3.** Defendant requests that we follow *Aguilar* and *Oropeza* and suppress the fruits of the warrant. However, since *Aguilar* and *Oropeza* dealt with affidavits based only on information supplied by a confidential informant, they are distinguishable. It is true that in *Oropeza*, the officer's supporting affidavit alleged that "surveillance conducted by officers of the City-County Narcotics Division established the above facts to be true." *State v. Oropeza*, 97 Idaho at 390, 545 P.2d at 478. However, in view of the conclusory nature of the above allegation, it comes as no surprise that corroboration of an informant's tip was not an issue in *Oropeza*.

**4.** Professor LaFave, in his treatise on the fourth amendment, points out that the existence of non-hearsay incriminatory information in the affidavit takes the problem outside the realm of the normal *Spinelli* corroboration problem.

"More difficult is the case in which it cannot quite be said that 'probable cause is established without necessary resort to the hearsay,' but where this other information standing alone is nonetheless highly suspicious. May it be said in such a case that the informant's story, albeit lacking a showing of the basis of knowledge, may be taken into account for the purpose of supplying the 'little bit more' which is needed to elevate this other information up to the level of probable cause? The answer is yes.

. . . . .

"A number of the lower court decisions which are based upon the unsound theory that corroboration may remedy an otherwise unestablished basis of knowledge could more readily be explained on the theory just stated." 1 W. LaFave, Search & Seizure, A Treatise on the Fourth Amendment, § 3.3(e) (1978), at 566–67.

Primer, 25 Mercer L.Rev. 741, 778–79 (1974)." *State v. Alger,* 100 Idaho at 678, 603 P.2d at 1112.

■ Appellant maintains, however, that the prior police observations cannot support a finding of probable cause because such observations took place thirty-nine and forty-five days prior to the issuance of the search warrant. The defendant contends that this "stale" information fails to establish "present" probable cause. It is generally true that "[a]n affidavit must provide facts sufficient to create probable cause for belief that the forbidden articles are within the place to be searched at the time the search warrant is requested." *State v. Oropeza,* 97 Idaho at 392, 545 P.2d at 480. Unfortunately, there exists no magical number of days within which information is fresh and after which the information becomes stale. The question must be resolved in light of the circumstances of each case. *Id.; Sgro v. United States,* 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932); *United States v. Hyde,* 574 F.2d 856 (5th Cir. 1978); *State v. Ingram,* 251 Or. 324, 445 P.2d 503 (1968). *See generally* Annot., 100 A.L.R.2d 524 (1965).

■ An important factor in "staleness" analysis is the nature of the criminal conduct. If the affidavit recounts criminal activities of a protracted or continuous nature, a time delay in the sequence of events is of less significance. *See United States v. Hyde, supra; United States v. Johnson,* 461 F.2d 285 (10th Cir. 1972).

Under appropriate circumstances, some courts have viewed drug trafficking as an inherently continuous activity. *Johnson v. State,* 14 Md.App. 721, 288 A.2d 622 (Md. App.1972). In *Johnson,* the lapse of time was twenty-six days. As in the case at bench, there had been two prior observations of drug trafficking by law enforcement personnel. The *Johnson* court stated that the activities described in the affidavit "seemed to suggest a continuing business in the distribution of narcotics." *Id.,* 288 A.2d

at 628. *Cf. United States v. Harris,* 482 F.2d 1115, 1119 (3rd Cir. 1973) ("[p]rotracted and continuous activity is inherent in a large-scale narcotics operation").

■ In this case, we believe that the two prior heroin deliveries observed by law enforcement officers at least raise the inference that the defendant was engaged in the continuing business of distributing narcotics. It must also be noted that Lt. Galland used the present tense in describing the information provided by the confidential informant.[5] Use of the present tense, even by a confidential informant, lends support to a finding of "present" probable cause. *See State v. Boudreaux,* 304 So.2d 343 (La.1974); *State v. Clay,* 7 Wash.App. 631, 501 P.2d 603 (1972).

■ We specifically decline to hold whether the prior observations in this case would by themselves support a finding of probable cause. We hold only that such observations, when coupled with the informant's information that Gomez currently had in his possession and at his residence quantities of narcotics, raises this affidavit above the floor of probable cause. In so holding, we have taken into consideration the informant's impressive record as a source of reliable information in the past. We have also considered that, as previously observed, a strong veracity prong may strengthen other areas of weakness in the affidavit. Basically, the prior observations of the police officers suggest a protracted course of criminal activity on the part of the defendant, and the allegations of the confidential informant bring the activities of defendant current and place the evidence to be seized squarely in the defendant's residence.

We therefore conclude, allowing due deference to the decision of the magistrate in this case, that the prior investigative observations of defendant's criminal activity, bolstered by the information supplied by a highly reliable informant, are sufficient to support a finding of probable cause.

---

5. Lt. Galland's affidavit stated that "CARLOS GOMEZ *has* in his custody a quantity of" illicit drugs. (Emphasis added.)

## B. Securing the premises.

We next decide whether the initial entry, which was intended to "secure" the Gomez residence, was permissible. Agent Johnson and two other officers had entered the premises ten to fifteen minutes prior to the arrival of Lt. Galland, the defendant, and the search warrant. At the time of the initial entry, Galland and other officers were in downtown Parma, three to four blocks away, arresting the defendant. The arrest, pursuant to warrant, was executed at an auto parts store. When Galland arrived at the defendant's house a search was conducted and the evidence in question was seized.

■ Defendant claims the above procedure violated I.C. § 19–4408, and that any evidence seized must be suppressed. We cannot agree.

I.C. § 19–4408 reads as follows:

"19–4408. SERVICE OF WARRANT. —A search warrant may in all cases be served by any of the officers mentioned in its directions, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution."

We fail to see how the act of "securing the premises" in this case violated the terms of the above statute. The statute requires that the warrant be served "by any of the officers mentioned in its directions." Here, the warrant was directed to "any sheriff, constable, marshal or policeman" in Canyon County. It therefore included Agent Johnson and the two officers who initially entered and "secured the premises." The statute says nothing about the necessity of the warrant being present upon the initial entry. It requires only the presence of the officer or officers directed to execute it. Granted, the statute does require that the warrant be "served," which necessarily requires that the warrant be present. However, the statute does not specify whether the service must take place before the search is commenced.

■ The procedure for service and execution of search warrants is also governed by I.C.R. 41, Idaho's counterpart to Rule 41 of the Federal Rules of Criminal Procedure. We find the following comment of the United States Supreme Court to be equally applicable here:

"Rule 41(d) does require federal officers to serve upon the person searched a copy of the warrant and a receipt describing the material obtained, but it does not invariably require that this be done before the search takes place." *Katz v. United States*, 389 U.S. 347, 355, 88 S.Ct. 507, 513, 19 L.Ed.2d 576, 584 (1967) at n. 16.

*Accord, United States v. McKenzie*, 446 F.2d 949 (6th Cir. 1971); *State v. Wraspir*, 20 Wash.App. 626, 581 P.2d 182 (1978).

Several courts have concluded that the fact that the investigative officers initiated a search without the issued but undelivered warrant in their physical possession did not invalidate the search. *United States v. Woodring*, 444 F.2d 749 (9th Cir. 1971); *United States v. Cooper*, 421 F.Supp. 804 (W.D.Tenn.1976); *State v. Johnson*, 240 N.E.2d 574 (Ct.C.P.Ohio 1968). *See Mayorga v. People*, 178 Colo. 106, 496 P.2d 304 (1972); *Williams v. State*, 476 S.W.2d 300 (Tex.Cr.App.1972). *But see United States v. Seely*, 570 F.2d 322 (10th Cir. 1978). In *Woodring* and *Cooper*, the searches in question were commenced by agents who had been informed via radio communication that the warrant had indeed been issued. In *Cooper*, it was 1½ hours after the initiation of the search that the warrant finally arrived. Both courts declined to suppress the evidence.

■ The above concept is not foreign to Idaho law. Arrest warrants may be executed by officers without the warrant in their possession. I.C.R. 4(c)(3) (renumbered as I.C.R. 4(h)(3), effective July 1, 1980).

Nor has the practice of "securing the premises" been condemned by this Court. To the contrary, while we have never explicitly confronted the issue, we have twice commented favorably on the practice.

In *State v. Miles*, 97 Idaho 396, 545 P.2d 484 (1976), we said that while the officers could not conduct a warrantless search of

an automobile suspected of containing contraband, they could have posted a guard with the car, thereby securing it, while others went to obtain the warrant.

In *State v. Rauch*, 99 Idaho 586, 586 P.2d 671 (1978), we affirmed a trial court's suppression of evidence which was based, among other things, on the police officers' failure to comply with the Idaho knock and announce statutes, I.C. §§ 19–611 and –4409. The state's concern in *Rauch*, which was again expressed in this case, centered around the possibility that the drugs could have been easily destroyed unless the police immediately took action to prevent it. In *Rauch*, we recognized the legitimacy of the state's concern but declined to hold that it justified failure to knock and announce prior to entry.

"In this case as the trial court explicitly noted, the time frame involved gave probable cause to *enter and secure* the Rauch premises without a warrant but did not excuse the necessity of complying with Idaho's 'knock and announce' statute. There was no urgency which justified noncompliance with the statute even though there was probable cause to *enter and secure* the premises." *Id.* at 591, 586 P.2d at 676 (emphasis added).

▆ In the instant case, the defendant was arrested in a public place. The officers apparently feared that, given the size of Parma and the location of the arrest, their actions would attract attention and that a phone call to the Gomez residence might enable the occupants to quickly dispose of the drugs. This concern seems reasonable, especially in view of the informant's allegation that the drugs were possibly stored in the bathroom within ready reach of rapid disposal. In fact, this allegation prompted the magistrate to include a "no-knock" provision in the search warrant.

There is currently a split of authority among the courts concerning the effect of entries intended to secure the premises where *no* warrant has been issued. Some courts actively condone the practice of securing the premises while the warrant is being obtained. *See State v. Broadfoot*, 115

Ariz. 537, 566 P.2d 685 (Ariz.1977); *State v. Mankel*, 27 Ariz.App. 436, 555 P.2d 1124 (Ariz.App.1976). Other courts hold that the initial entry, assuming its constitutional or statutory infirmity, does not taint the second entry and search undertaken pursuant to a valid search warrant. *State ex rel. Hyder v. Superior Court of Maricopa County*, 114 Ariz. 337, 560 P.2d 1244 (1977); *State v. Smith*, 112 Ariz. 531, 544 P.2d 213 (1975); *People v. Hannah*, 183 Colo. 9, 514 P.2d 320 (1973); *State v. Fenin*, 154 N.J.Super. 282, 381 A.2d 364 (1977). Still others find the initial entry undertaken prior to the issuance of the warrant to be so repugnant as to require suppression of evidence subsequently seized pursuant to a validly issued and executed warrant. *United States v. Griffin*, 502 F.2d 959 (6th Cir. 1974), *cert. denied* 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974); *People v. Shuey*, 13 Cal.3d 835, 120 Cal.Rptr. 83, 533 P.2d 211 (1975); *State v. Matsen*, 287 Or. 581, 601 P.2d 784 (1979); *State v. Bean*, 89 Wash.2d 467, 572 P.2d 1102 (1978). However, we need not choose between these conflicting lines of authority. Today we hold only that an entry intended to secure the premises is not improper when undertaken *after* and with knowledge of the issuance of the warrant, but prior to its arrival at the premises to be searched.

C. The Non-existent House Number.

▆ The defendant's final attack on the validity of the search is based on an error in the description of the subject premises. The search warrant issued by the magistrate indicated that the house was "identified with the number 204 posted on the front of the house ...." While there is a conflict in the testimony, a preponderance of the evidence indicates that the number did not appear on the house at the time of the search. Defendant insists that this discrepancy invalidates the search warrant, citing *State v. Yoder*, 96 Idaho 651, 534 P.2d 771 (1975). In *Yoder*, we held that "[t]he description must be sufficiently clear so that the property to be searched is recognizable from other neighboring properties." *Id.* at 653, 534 P.2d at 773. The only distin-

guishable description contained in the *Yoder* warrant and supporting affidavit was an incorrect house number.

In *State v. Hart,* 100 Idaho 137, 594 P.2d 647 (1979), we held that a district court erred "in quashing a search warrant where the house to be searched was described by an erroneous house number, but was further identified by additional physical features contained in the warrant." *Id.* at 138, 594 P.2d at 648. We think *Hart* is controlling. *See State v. Carlson,* 101 Idaho 598, 618 P.2d 776 (1980).

In the instant case, the warrant described the premises to be searched as "a white single-story frame dwelling house located at Route 3, Parma, Idaho, on a road known as Highway 18 or Roswell Boulevard, located in the middle of the block on the east side of the highway between Wendle Street and Park Street, in Canyon County, Idaho, which is under the possession and control of one CARLOS GOMEZ."

It is immediately clear that the detail in this description surpasses the description in the *Yoder* warrant. Significantly, the Gomez residence was the only house on the east side of Highway 18 between Wendle and Park Streets. The possibility of a mistaken identification being minimal, we conclude that the description in the warrant is sufficient.

## II

■ Defendant next contends that the trial court erred in limiting his cross examination of Lt. Galland at the suppression hearing. The court did not permit defense counsel to ask Galland whether photographs were taken on the exterior of the house on the day of the search. Defendant also asserts that he was denied due process of law by virtue of the state's failure to disclose certain photographs taken the day of the search. These photos established that the number "204" did not appear on the front side of the house.

Both of these contentions concern the adequacy and accuracy of the description of the premises in the warrant and supporting affidavit. As we have previously conclud-

ed, the description is sufficient apart from any disparity with respect to house numbers.

## III

We now turn to issues concerning the evidence of defendant's intent to deliver the narcotics in question. During the trial, the state elicited testimony from one Hendrix, a special agent for the federal Drug Enforcement Administration. The trial court found that Hendrix's experience and training qualified him as an expert in narcotics investigation and paraphernalia. Defendant does not dispute that finding.

■ Hendrix's direct examination culminated in the following exchange:

"Q. Now, based upon your experience, training and education, familiarity with narcotics and narcotics users, Officer Hendricks, do you have an opinion as to whether or not an individual addict would possess 15 grams of heroin for his personal use?

. . . . .

"A. I do not believe so. I have never seen an addict have that quantity for his own use.

"Q. And on what do you base that opinion?

"A. Past cases we have worked involving narcotics traffickers as opposed to an individual addict."

Defendant objects to this testimony. We see nothing improper in its admission. The above question is a hypothetical one. *See* G. Bell, Handbook of Evidence for the Idaho Lawyer, at 66–68 (1972). Previous testimony had established that fifteen grams of heroin had been found in defendant's residence. The factual foundation for the hypothetical question was therefore present in the record. The trial court did not err in permitting Hendrix to express his opinion. *See State v. Badger,* 96 Idaho 168, 525 P.2d 363 (1974); *State v. O'Mealey,* 95 Idaho 202, 506 P.2d 99 (1973).

Defendant's final challenge is directed at the sufficiency of the evidence. He con-

cedes that the record supports the possession conviction, but claims there is no substantial evidence of an "intent to deliver." The function of this Court in considering evidentiary sufficiency is limited to determining whether there exists substantial and competent evidence. *E. g., State v. Kellogg,* 100 Idaho 483, 600 P.2d 787 (1979).

In our judgment, the evidence sustains defendant's conviction. The physical evidence introduced at trial included one packet of fifteen grams of a powdery substance containing 17% heroin, one metal container containing twelve individual tinfoil packets of a powdery substance ranging from 8% to 14% heroin, and scales suitable for weighing. Special agent Hendrix, whose expert qualifications are uncontroverted, testified that not only the quantity, but also the packaging and purity of the heroin seized at defendant's residence were consistent with sales activities and, conversely, inconsistent with mere use. Agent Hendrix's testimony was substantially corroborated by the testimony of Lt. Galland. It cannot be said that the evidence is insufficient. *See State v. Badger,* 96 Idaho 168, 525 P.2d 363 (1974).

The judgment of conviction below is affirmed.

DONALDSON, C. J., McFADDEN, J., and SCOGGIN, J. Pro Tem., concur.

BISTLINE, J., dissents.

BISTLINE, Justice, dissenting.

I.

PREFATORY REMARKS

In my time on the Court there has not been another case before us with more far reaching consequences than this. One aspect of the appeal has to do with defendant's claim that the affidavit purporting to support the issuance of the search warrant was insufficient upon which to base the requisite finding of probable cause. I am unable to agree with the Court's conclusion that it was—which conclusion runs against prior decisions of the Court and against a well settled body of general law, as will be discussed further on. As regards this issue, the Court's opinion, while it is unsettling of the law and leads to a wrong result, affects just the particular defendant, Gomez, and he will be neither the first nor the last person who has suffered through error at trial or error on the part of an appellate court.

The case goes far beyond the instant defendant, however. The Court's opinion as written goes far in aiding and abetting the deepest intrusion on Fourth Amendment rights that it will be the country's misfortune to have encountered in recent years—perhaps in all time since the nation was founded. My primary concern in this case—one which also involves an invasion of defendant's constitutional rights—is the extreme ease with which the Court adopts and approves of the newly discovered police-state doctrine which is referred to as "*Securing the Premises*"—a doctrine so new that the Court, in its opinion, recognizes the necessity for mentioning it only when circumscribed with quotation marks.

"Securing the Premises" has not, to my knowledge, and in my opinion, heretofore received the approval of this Court. In *State v. Rauch,* 99 Idaho 586, 586 P.2d 671 (1978), a 1978 decision of the Court in which I participated and joined the Court's opinion, we had for our consideration only the review of a trial court order suppressing evidence for noncompliance with the Idaho knock-and-announce statutes. The trial court determination was based upon a factual finding that the prosecution had not produced any evidence of exigent circumstances which would justify the noncompliance. That evidentiary finding was found by the Court to be sustained by the appeal record, and on that basis we affirmed. A dissenting justice in that case would have held otherwise, and inserted into his opinion a quotation of remarks made by the trial court to the effect that there were exigent circumstances "which gave probable cause for believing that entry was needed *to secure the house and monitor the residents* before the search warrant arrived to pre-

vent removal of contraband from the house." 99 Idaho at 595, 586 P.2d at 680. It must be remembered that was *not* the Court's opinion. The Court's opinion in *Rauch* did concede to the dissent that the trial court had so remarked, again setting the same forth, and proceeding to explicitly point out that exigent circumstances, when found to exist, can "allow police to enter, search, seize and arrest without complying with the warrant requirements of the United States Constitution ...." 99 Idaho at 590–91, 586 P.2d at 675–76. Plainly and simply, we pointed out that evidence seized on warrantless entries will not always be suppressed, and then distinguished between such warrantless entries, on the one hand, and warrant entries without knock-and-announce compliance, on the other. We agreed with the trial court's analysis of the evidence, saying that "[t]here was no urgency which justified noncompliance with the statute...." 99 Idaho at 591, 586 P.2d at 676. That was the exact issue which was there presented, and that was our holding, wherein, in Justice Donaldson's well reasoned opinion, we joined with courts which take seriously the legislature's requirement that police in making warrant entries do not, except when acting under exigent circumstances, merely break in without giving advance advice of their presence and purpose. The sentence which announced our holding contained the additional language, picked up from the trial court's twice-quoted passage, that "there was probable cause to enter and secure the premises." 99 Idaho at 591, 586 P.2d at 676. In that regard, as I understood the language then, and still read it to this day, we were saying that the officers could have made a warrantless entry based upon exigent circumstances, but the type of exigent circumstances found to exist were insufficient to justify ignoring the requirements of our knock and announce statute. Whatever thoughts the trial court may have entertained in making his remarks, and whatever the other members of the Court may have considered with regard to "securing the premises," it is altogether clear to me that the only issue in the case was whether or not the knock-and-announce requirements could be disregarded in making the entry which was there made. What was said about securing the premises in the Court's opinion was mere obiter, and to my mind capable only of the interpretation that the Court was gratuitously hypothesizing that a warrantless entry might have been properly made under the circumstances then and there existing. "Securing the Premises" was not an issue in the case.

Of real pertinency to the case of this defendant is the Court's observation in *Rauch*, agreeing with the trial court, that "sheer speculation" is an insufficient premise for the exigent circumstances necessary to make an entry of a home without compliance with the statute. 99 Idaho at 591, 586 P.2d at 676. Sheer speculation is also an insufficient premise for the exigent circumstances required where constitutional prohibitions against warrantless entries are involved, my view being that the constitution is a stronger mandate than a legislative requirement.

That which the Court does today is a far cry from our observations in *Rauch* as to the "basic right to be secure in a person's home, guaranteed by the fourth amendment ..." 99 Idaho at 592, 586 P.2d at 677; "[t]he very sanctity of the home ..." 99 Idaho at 593, 586 P.2d at 678; the fact that " [s]uch action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle.' *Miller v. United States*, 357 U.S. 301, 307, 78 S.Ct. 1190, 1194, 2 L.Ed.2d 1332 ..." 99 Idaho at 592, 586 P.2d at 677; the fact that "[t]he exclusionary rule has been the basic guarantor of freedom from illegal police action...." *id.*; and the fact that " [e]very householder, the good and the bad, the guilty and the innocent, is entitled to the protection designed to secure the common interest against unlawful invasion of the house.'" 99 Idaho at 594, 586 P.2d at 679 (quoting *Miller, supra,* 357 U.S. at 313–14, 78 S.Ct. at 1197–1198).

*Rauch* was a well reasoned and well articulated decision of this Court, and represented a significant bulwark against unlawful intrusions into the privacy of the home.

Yet, according to my recollection, it went unnoticed and unheralded—which is unusual in view of the media's general concern with constitutional rights, especially those engendered by the First Amendment. Although there was a vigorous dissent in the disposition made of that case, in which another justice joined, still the media apparently believed the case of little importance. So, other than that it was important to that particular defendant and to the state's police officers, the case caused little stir. At about the same time the Court also split three-two on another case involving the rights of Idaho people to protect themselves in their homes and while traveling on the highways in their automobiles, motor homes, and other vehicles. In *State v. McNary*, 100 Idaho 244, 596 P.2d 417 (1979), the Court expanded I.C. § 18–3302 beyond its plain language, and held that the statute prohibited the concealed keeping of weapons within homes which were within city limits or within vehicles operating on public highways. Despite the importance of the issue, and the split in the Court, nothing was written or said about the case and it is not known to this day if the legislature showed any concern for the strained interpretation of its statute. Such recollections put me in mind of the remarks of Justice Byron White of the United States Supreme Court, given at the State Bar Convention in Sun Valley in July 1979, to the effect that although that Court's opinions were out, the debate still raged on as to the validity of the varying views espoused in the various opinions just then handed down. I have thought, and continue to believe, it unfortunate that after the members of this Court struggle mightily with some of the difficult issues with which we are faced, no one feels free or motivated to either assail or defend the direction in which the Court has moved.

A recent ray of light, and one which may support the extra effort required by my extreme concern and deep involvement in this particular controversy, was some interest in Fourth Amendment rights expressed by a local paper in just this last year. Of great encouragement to those who would struggle to protect those rights was the rather singular fact that the comment, in the form of an editorial, saw a recent United States Supreme Court opinion[1] as running "counter to the Fourth Amendment protection against unreasonable search and seizure." Noting that past Supreme Court rulings "have curbed police excess," the editorial went on to say that the recent ruling quite obviously showed a change of view in that Court, and that "[t]he court was unmindful of the potential dangers of the ruling . . .," the circumstances of which it took the pains to lay out to its readers. The editorial concluded with a message which compels me to continue with renewed vigor my sworn obligation to enforce the Fourth Amendment rights which I see being violated today:

> "The highest court in the land told police and prosecutors that it has no aversion to the most repugnant police practices as long as the evidence that is obtained is used against defendants who don't happen to own a briefcase that is stolen, a residence that is burgled or a car that is illegally searched. But the court ignored the rights of the party who owns the briefcase, residence or car. *It also ignored excesses by the police and sent a confusing and dangerous message to police agencies.*" (Emphasis added.)

Fourth Amendment rights are not the particular concern of judges and lawyers, but are and should be the concern of all the people of this country—in which regard it is gratifying to see those rights debated and argued, whether the views espoused be pro or con.

## II.

## WARRANTLESS ENTRY TO "SECURE THE PREMISES"

It was unfortunate that the fact of the warrantless entry did not become disclosed

---

1. Obviously *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468, decided June 23, 1980.

until midway in the trial. I say that with the thought in mind that the trial court here might very well have ruled otherwise given a full-blown pre-trial inquiry into the facts and circumstances, given more time and opportunity to consider the scant law available on entries made to "secure the premises," and given more time to weigh the authority in light of the incontrovertible language and purpose of the Fourth Amendment to protect the people in the privacy of the home. The remarks of the trial court show an extreme concern and quite apparent disenchantment with the police action in breaking into the Gomez home without having at hand a warrant to do so, with the court ultimately being swayed by some authority from Arizona—which Arizona authority will be hereinafter discussed with regard for its shallow reasoning and callous disregard for rights guaranteed to the people.

Ordinarily, of course, a motion to suppress must be made prior to trial. *State v. Conner*, 59 Idaho 695, 89 P.2d 197 (1939). But that opinion recognized, as did the trial court here, that there must be an opportunity to raise the issue. Here the record conclusively shows that the Gomez residence, when unlawfully broken into, was occupied only by Maria Gomez and the child. Mr. Gomez was not at home, and counsel who was to later represent Mr. Gomez had no information that the entry was warrantless until the fact was divulged at trial on examination of officer Paul Johnson.

The record is conclusive that Mrs. Gomez, had she had any reason to be looking out of the house at the precise time the police arrived, would have seen three grown men approach her house, none of them in uniform, having just exited from a vehicle which was not a police car. At trial the testimony of Officer Johnson was that all three were armed. The testimony did not develop whether these officers were garbed in the manner undercover agents often dress while in pursuit of their quarry— which is much in the manner of those who are under suspicion—and did not develop whether they had drawn their weapons as they burst into the residence. It is likely that one or more may have been so attired, and it is also likely that they would have drawn their weapons. If so, and except for the fact than that no one was within other than a woman and child, the situation was fraught with dangers of violence and disaster such as was one of our grave concerns in upholding and applying the validity of our knock-and-announce statute in *Rauch*. There we said: "The very need for compliance with 'knock and announce' statutes and the great danger from noncompliance requires strict enforcement." 99 Idaho at 592, 586 P.2d at 677.

The warrantless entry came to light, immediately catching the attention of the trial judge, when Officer Johnson was on the stand on direct examination:

"Q Why did you go to that particular residence, agent Johnson?

"A I went there to secure the residence and initiate a search warrant on that residence.

"THE COURT: Would you speak up a little more. They are having difficulty hearing, apparently. Would you read that back. Possibly the jury missed part of that, and I know I did.

(Reporter read)

"Q Did you enter those premises with the warrant?

"A No, sir, I didn't. I entered the premises to secure. Lt. Galland had the warrant.

"Q And who was present when you entered the premises?

"A At that time it would be Deputy Cortez, who was with the Canyon County Sheriff's Office.

"THE COURT: Now, I am still having difficulty. The officers went into the house?

"A Yes, sir. Officer Cortez, Officer Carr and myself were the ones that went into the house. . . .

. . . . .

"Q Now, you have testified that you actually entered the house prior to the time search was conducted.

"A Right, sir.

"Q And you and Lt. Galland and—excuse me. You and Lt.—Officer Cortez.

"A Officer Cortez.

"Q —Went inside the house. Was it with Officer Carr?

"A Yes, sir, it was.

"Q Did you arrest anybody inside the house?

"A No, sir we didn't.

"Q Who was there?

"A There was a woman inside with a small child.

"THE COURT: *At this point are you saying that you went into this house before the search warrant arrived?*

"A *Yes, sir, we did.*

"Q *Did you have the search warrant with you at that time?*

"A *No, sir. At that time we went into the house Lt. Galland had the search warrant.*

"Q *And Lt. Galland wasn't present.*

"A *He—no, sir.*

"THE COURT: I don't understand.

"MR. FULLER: This is new evidence to me, and I would like to have a recess for the purpose of making a motion outside the jury.

"THE COURT: I think at this point we should have some testimony outside the presence of the jury. Recess the jury at this time for whatever time it might be necessary for this part of the case. During the recess that you are about to take, members of the jury, you must heed the admonition I have heretofore given you relative to recesses. You will be called back in due time.

(Jury recessed at 3:23 p. m.)

(Following proceedings had in the absence of the jury:)

"MR. FULLER: Your Honor, may I proceed to ask a few more questions, or does the Court—

"THE COURT: Perhaps maybe I should. This is a very material point. I thought I heard you testify when the jury was present that you went in before the search warrant arrived.

"A Yes, sir, that's correct.

"THE COURT: And then in another question—maybe I misheard you—I thought you said that you didn't go in until Lt. Galland had arrived with the search warrant.

"A No, sir. I answered to the question when was the place searched. When I initially went in the first time it was not searched. It was secured. When Lt. Galland arrived the search warrant was read, at which time the search of the premises was commenced.

"THE COURT: What did you do when you secured the premises?

"A Sir, we just basically made sure that no one entered or left the place, and no evidence would be able to be destroyed.

"THE COURT: How did you make entrance?

"A We made entrance through the back door and through the front door.

"THE COURT: Simultaneously?

"A Simultaneously as you can get without any form of communication besides just someone going around the back door and you going in through the front door.

"THE COURT: You went in one way, did you?

"A Yes, sir. Myself and Deputy Carr went in the front door, and Deputy Cortez went in the back door.

"THE COURT: And what occurred when you went in the front door?

"A When I went in the front door I noticed the female and the small child and Deputy Cortez in the house, at which time we proceeded to check the rest of the house to see if anyone else was within the house.

"THE COURT: Did you go clear through the house?

"A We just went through and checked the rooms real fast to look and see if anyone was in either the rooms or the closets.

"THE COURT: How long was it after that that the search warrant arrived?

"A Approximately 4:00 o'clock when we went in, and approximately 4:10 is when Lt. Galland arrived with Mr. Gomez.

"THE COURT: Did those at the back door come in through the house and go all through it?

"A No, sir. Basically to my best recollection it was Officer Carr and myself who checked the room and secured the bedroom and the front room area. I believe Officer Cortez was the one that secured the kitchen area and the wash basin area.

"THE COURT: Now, you say you went in through the front door.

"A Yes, sir.

"THE COURT: What happened when you went through the front door. Did you knock first?

"A Yes, sir. We knocked on the door and advised them that we were deputy sheriffs from Canyon County Sheriff's Office, and to open up, that we had a search warrant, and we were going to secure the residence.

"THE COURT: You advised them to open up.

"A Yes, sir.

"THE COURT: You were from the sheriff's department, right, sir?

"A And we had a search warrant for the premises.

"THE COURT: And that you had a search warrant.

"A Yes, sir.

"THE COURT: But you actually didn't have a search warrant yet, and it arrived about ten minutes later.

"A I did not have the search warrant in my hand at the time. Lt. Galland had it, and he was in the City of Parma, and at which time he was placing Mr. Gomez under arrest, and the search warrant was for drugs, and at that point Lt. Galland advised us to secure the residence and make sure nothing was destroyed.

"THE COURT: Were you advised by telephone that the warrant was in Mr. Galland's possession at the time you went in the front door?

"A At the time, sir, I had personal knowledge that Lt. Galland had the search warrant.

"THE COURT: If he was in town and you were out at the residence, how far apart were the two residence, where the residence is and you say downtown Parma?

"A Probably three to four blocks.

"THE COURT: You say you had personal knowledge.

"A Yes, sir. We left the sheriff's office at the same time.

"THE COURT: When you got to the place to secure it, the search warrant wasn't there, but got there about ten minutes later.

"A Yes, sir. It arrived with Lt. Galland, who had Mr. Gomez under arrest.

"THE COURT: Now this is highly unusual that a Judge would get into questioning like this. It will be open to questions on either side. Mr. Fuller, you may proceed with any questions that you might want here.

"Q (By Mr. Fuller): At the time you went in the front door was Mrs. Gomez inside the house?

"A At the time I went through the front door when I got into the front room area I saw a female who I believed later was identified as Mrs. Gomez.

"Q You opened the front door yourself.

"A Yes, sir, I did.

"Q —And went in.

"A Yes, sir.

"Q Mrs. Gomez did not invite you in.

"A As far as I can remember I did not hear anyone answer.

"Q And after you got into the residence you went around and looked in the rooms in the residence, is that correct?

"A Briefly looked into the rooms to make sure there was no one else within the residence itself.

"Q And you and Officer Carr did this.

"A Officer Carr and Officer Cortez was the other officer that I went with.

"Q At that particular time did you have an arrest warrant for anybody that you found inside the house?

"A No, sir. The only one we had an arrest warrant for was Mr. Gomez.

"Q And did Officer Galland have that?

"A Yes, sir.

"MR. FULLER: I have no further questions, Your Honor.

REDIRECT EXAMINATION BY MR. DRESCHER ON MOTION:

"Q Paul, at the time you entered this residence and you moved throughout the house would you describe in detail your activities and movements for us, please.

"A Yes, sir. As we arrived to the front of the residence I advised Officer Cortez to go around to the rear and secure the rear side of the house, and at that time he got out of the vehicle. He proceeded to go around to the north side of the building to the east side which would be—what we considered the rear of the house, and at that time also Officer Cortez went to the south side of the building and checked that to see if there was any other doors or anyone around there. He came back. We knocked on the door. We advised them. We identified ourselves and advised them of the purpose for being there, at which time we went into the residence. When we entered the residence Officer Cortez, a female and a small child was in the area of the front room and the kitchen, at which time myself and Officer Carr went to a bedroom which was off to my right, and went back around and went in and checked the wash basin area which was through the kitchen and back of the house and bathroom area to make sure that there was no one there. What we did was look through the door very quickly and briefly to see if there was someone standing there or behind the clothes in the closets and that is basically it.

\* \* \* \* \*

"Q In the course of your actions as you entered this home, Agent Johnson, did you open any drawers?

"A No, sir. The only thing that we did, as I stated, was look in the rooms for individuals, and we advised the female that again who we were, and that we were from the sheriff's office, and we had a search warrant for the premises, and that her husband—I believe it was Officer Cortez was talking to her in Mexican—I can't be sure—advised that Carlos was arrested and other people would be here in a matter of time.

"Q Did you show Mrs. Gomez any identification?

"A Sir, at that time we were in uniforms, complete uniforms, deputy sheriff uniforms, and our badges were out there, and we did identify ourselves. It was quite obvious who we were.

"Q You were in full uniform.

"A That's correct.

"Q Were you armed?

"A Yes, sir, we were armed.

"Q What kind of vehicle were you driving?

"A I was driving a marked deputy county sheriff patrol vehicle.

"Q Would you describe that vehicle for us.

"A Yes, sir. It is a light tan in colored vehicle, a Plymouth, and it had lights on the top that are used for emergency situations and runs, and it had other essential things that identified it as a sheriff's vehicle.

"Q Would you describe your uniform, please.

"A Uniform again is sort of a light tan colored uniform. It has a badge in the front. Your weapon, holster and everything else. Your patch which also states that you are deputy sheriff from Canyon County, and a complete uniform type thing.

"Q Now, when you entered this residence, Paul, do you recall whether or not Mrs. Gomez said anything to you?

"A The only thing I remember about her, she was extremely upset at first. The

small child was crying, and Deputy Cortez was talking to her and trying to settle her down at that time, and I really can't recall anything verbatim exactly what she stated or anything at that time.

"MR. DRESCHER: I don't think I have any further questions at this time, Your Honor.

RECROSS–EXAMINATION BY MR. FULLER ON MOTION:

"Q Mr. Johnson, when you went to these other rooms did you open doors to go into those rooms?

"A No, sir. All the doors were open.

"Q Did you go into the rooms?

"A Sir, just went into the room and looked around to see if there was any bodies. That is basically what we did.

"MR. FULLER: I have no further questions. I do have a motion to make, Your Honor.

"THE COURT: I have a few questions myself, further questions I would like to ask. If I understood your testimony correctly, you saw the original search warrant in Lt. Galland's hands.

"A Yes, sir, to my best recollection.

"THE COURT: And he had it, secured it from the magistrate?

"A At that time, sir, we were in the office at the CCND, which is in the basement of the sheriff's office. The search warrant was obtained, and at that time we decided how we were going to proceed out to Parma to the residence itself.

"THE COURT: And in what city was the search warrant obtained?

"A Sir?

"THE COURT: Caldwell?

"A To my best recollection it was obtained in this Courthouse.

"THE COURT: Then you left immediately. You say it was your understanding, or did you actually see what you thought was a search warrant?

"A I saw what I thought was a search warrant, and I also, during the process that the search warrant was being obtained, I

was asked about information about the exact location of the residence in the city limits of Parma.

"THE COURT: So then after you saw what you thought was the original search warrant, you took off immediately for Parma.

"A I left for Parma and went in the same direction as Lt. Galland went.

"THE COURT: Did you go with Lt. Galland to Parma?

"A Yes, sir, but we were in separate vehicles.

"THE COURT: Then if I understand correctly, you went to the house, and did you knock?

"A Yes, sir, we did knock.

"THE COURT: And Mrs. Gomez came to the door, did she?

"A No, sir she didn't.

"THE COURT: Who came to the door?

"A Nobody came to the door.

"THE COURT: Then you opened the door.

"A Yes, sir, we did.

"THE COURT: Did you walk in?

"A Yes, sir, we did.

"THE COURT: And there you saw Mrs. Gomez.

"A Yes, sir.

"THE COURT: —And a small child.

"A Yes, sir.

"THE COURT: Had you seen Mr. Gomez arrested by that time?

"A At that time, sir, we were advised over the radio that he was being arrested, and to secure the residence.

"THE COURT: Now, the time area here, you had been, after your first entry to the house through the front door and entry through the back door by the other men that you have described, it was about ten minutes, was it, before Lt. Galland appeared on the scene with the search warrant in his hand.

"A Right, sir.

"THE COURT: And did he exhibit the search warrant to the people in the house?

"A Yes, sir.

"THE COURT: Does either counsel have further questions?

"MR. DRESCHER: Not from the State.

"Q (By Mr. Fuller): I understand, Mr. Johnson, the testimony is that you had not been advised that the arrest had actually been accomplished, but the arrest was in the process of being made.

"A The arrest was being made. It came over the radio that the individual was being arrested, and we were advised to secure the residence.

"Q But you weren't advised that it actually had been done.

"A To my understanding what was stated over the radio, that the individual was being stopped and was being arrested. There was all forms of traffic over the radio in reference to stopping the individual and having him placed under arrest, and finally when the individual was stopped, being placed under arrest, we were advised to secure the residence.

"Q So what you got it—is that message from Lt. Galland.

"A To my best recollection it was from Lt. Galland. There was other people on the radio at that time.

"Q So you are saying Lt. Galland radioed you and said Mr. Gomez was being stopped and was being arrested.

"A To my best recollection of that.

"Q It was Lt. Galland who was radioing you.

"A Like I said, sir, other people on the radio. Lt. Galland was on the radio. The advice was he was being arrested. To my best recollection the instruction was given by Lt. Galland in fact that the arrest was being performed at that time, and for us to secure the residence.

"MR. FULLER: I have no further questions.

"THE COURT: Were you informed or did you learn of where it was that Mr. Gomez was being arrested?

"A Mr. Gomez was being followed into the city limits of Parma prior to the time that we got to the city limits, and when we entered the city limits we were advised to proceed to the residence, and at which time I believe it was Chief Howery and Lt. Galland were in the process of following and locating Mr. Gomez, and when we were at the house we were advised of our vehicle's location and everything else, during which time they came over the radio that Mr. Gomez was being arrested, and that we should secure the residence in which the search warrant was obtained for, and to my best recollection that was given over the radio in conjunction with things by Lt. Galland.

"THE COURT: As far as you know the arrest was made several blocks away from the residence.

"A Yes, sir, to my best recollection it was.

"THE COURT: And Lt. Galland had that search warrant with him, wherever it was that he was arresting the defendant, as far as you know.

"A Yes, sir.

"THE COURT: I have no further questions."

At that point in time defense counsel moved the court to suppress the evidence which had been seized at the Gomez residence, basing the motion on the grounds that "there was seizure of this particular residence before a valid search warrant was present at the residence," and that "there was a search of the residence by the officers going through the house," to which he added that there was not "any difference whether they are looking for people or whether they are looking for narcotics."

The prosecutor responded with his view that "the issue before us now is far too grave to be decided without the benefit of some research and investigation as to what the precise state of the law is with regard to this issue." Arguing briefly, he urged "that the residence was only secured. Nothing was seized." He strongly empha-

sized that "these officers were in uniform. They had on guns. They had on badges, and you top that off with that they were in marked cars." He contended that officers so marked and so identifiable as officers, having knowledge of the existence of a warrant, should be permitted *to secure the premises*, especially where another officer elsewhere was arresting the defendant. His strongest argument was, and it is better set forth verbatim: [2]

> "Now, must they sit idly by outside in marked cars and uniforms as the individuals within that particular residence make hasty note of all these cops pulling up outside and proceed to destroy the very evidence for which the warrant which had previously been issued was so issued? I would suggest, Your Honor, that it is the preferable practice to secure these dwellings, and I wish we could supply the Court with some authority."

The trial judge agreed that the question was grave, and recessed the trial until the next morning, so that both court and counsel could search out any available law. The court summed up the issue for counsel:

> "THE COURT: The point that bothers me in this case is the fact that there was some ten-minute lapse. There was apparently, according to the testimony of this witness, the search warrant obtained. There is a question involved of an arrest of the defendant, Mr. Gomez, at approximately that time. Apparently the arrest was in process of having taken place. The arrest was several blocks away, and the question of going into the place, making any kind of a search incident to the arrest I don't think is present here. The question apparently is, as you have stated, Mr. Drescher, can the existence of a search warrant in being be the basis for, as the term is put in the case, securing it, but which goes a long ways, going completely through the house, without invitation, without any other authority than

there apparently being a search warrant in existence at another location."

On the following morning, before the trial court received the law uncovered by counsel, the prosecutor advised the court that Officer Johnson had advised him of certain inaccuracies in his testimony given the previous day. In answer to the court's question, Mr. Johnson testified that *none* of the three officers had been in uniform when they broke into the Gomez residence, and they had *not* arrived there in marked police vehicles. No further testimony was offered by either party. The court proceeded to hear from counsel.

As to "Securing the Premises," defense counsel argued that such doctrine was similar to search and seizure pursuant to an invalid arrest, "because what you are doing is you are going on the premises, you are in effect searching and seizing the premises in an invalid way." He analogized such an unlawful entry to a consent search following an illegal arrest, as against a consent search where no arrest has been made, citing *State v. Barwick*, 94 Idaho 139, 142, 483 P.2d 670, 673 (1971), where the Court held that "where the consent and search are accompanied by an illegal arrest, the events are so intertwined, one with the other, that the consent does not expunge the taint of the illegal arrest." Counsel urged that "once you have the illegal entry, the illegal search and seizure, that that so taints everything that happens after that, the events are so intertwined that ... all the evidence should be excluded that was the result of the subsequent search and seizure when they came with the search warrant." Other authority submitted had to do with searches incident to arrest, in regard to which the trial court saw no real problem, where there was no arrest at the premises which had been "secured." The court did express himself as being bothered with "how far can the officers go in securing, as the term is used, premises in advance." He

---

**2.** This argument will be later referred to with respect to the statement in the Court's opinion that "The officers *apparently* feared that, given the size of Parma and the location of the arrest, their actions would attract attention and that a phone call to the Gomez residence might enable the occupants to quickly dispose of the drugs." I have underlined "*apparently*" as this word as so used here takes the place of testimony to that effect, there being none whatever.

added that the testimony was only to the effect that there was no search made for any object, although the whole house *was searched* for persons.[3]

Defense counsel also engaged the trial court in a meaningful discussion relative to the lack of any testimony establishing exigent circumstances, counsel conceding that some hypothetical circumstances might have justified the entry made here without a warrant, but insisting such circumstances were not here established. Much that defense counsel urged was entirely consistent with the statements made by this Court in *State v. Rauch, supra,* although our decision in that case had not then been announced.

The prosecutor, at his turn, relied upon decisions of the Arizona courts, primarily *State v. Smith,* 112 Ariz. 531, 544 P.2d 213 (1975). He placed some reliance on the Colorado case of *People v. Hannah,* 183 Colo. 9, 514 P.2d 320 (1973). His argument was quite direct: "Securing the Premises" is a sound doctrine, because the courts of Arizona have said so; evidence seized pursuant to the warrant should not be suppressed because of the prior securing; there is no link. Finally he said, in language similar to that the Court uses in its opinion:

"I would also submit, Your Honor, that the community of Parma is a very small community; that the defendant's arrest within that community could very likely, and I think the police could be justified in presuming that the defendant's arrest in a small town like that would call some interest, direct some attention toward their affairs.

"Mr. Gomez' residence could be notified, and evidence could be destroyed."

This argument was *sheer speculation.* Worse, it was the sole source of exigent circumstances in this case. *Our own warnings* in *Rauch* to trial courts and to police officers have therefore gone unheeded by today's majority.

## III.

## "SECURING THE PREMISES"—A FALLACIOUS AND PERNICIOUS DOCTRINE

At this point a number of things are clear and need restating before moving on to a discussion of the available case law by which the Court is today persuaded to stamp its imprimatur on the doctrine of "Securing the Premises."

(1) The Court in its opinion has clearly chosen to disregard and give no mention to the fact that the trial judge did not accept the doctrine, but on the contrary was quite disturbed at the police conduct here in question. The trial judge reasoned that the questionable evidence could be admitted on the basis that the subsequent warrant "search" of the premises, that is the drawer-by-drawer and closet-by-closet ransacking of it, was separable from the no-warrant earlier search of the premises, where the three officers merely roamed the length and breadth of the house, completely commandeering it and observing that which was to be observed with the naked eye.

(2) Totally unlike *Rauch,* there was no evidence presented to the trial judge that the officers had any reason to engage in surmise that Maria Gomez and the child might busy themselves in flushing contraband down the drains on receiving a telephone call from some unknown person to do so (certainly not the handcuffed and guarded Gomez); nor did the officers testify to entertaining such fears, whether or not sustained by the observed circumstances.

(3) Nonetheless, the Court is willing to gloss over the requirement of facts and circumstances showing exigent circumstances of some kind, by the innuendo that there was such evidence—when in fact there was none. This the Court accom-

---

**3.** For some reason, not explained, and despite the highly unusual recantation of Officer Johnson's testimony as to being fully uniformed and in marked police vehicles, the trial court stated a clear misconception of the law as I understand it: "The thing that bothers me in this case is the fact that I have to take the testimony of Mr. Johnson as being true for purpose of this motion, and I am not saying it is true or not true. I have to accept it at face value for the purposes of this motion."

plishes by writing that "[t]he officers apparently feared that, given the size of Parma and the location of the arrest, their actions would attract attention and that a phone call to the Gomez residence might enable the occupants to quickly dispose of the drugs." There was no such evidence, but the reader of the opinion would more likely than not conclude that there was. For all that the record shows neither Maria Gomez nor the child were involved with drug peddling, and there may not have been a phone. *Had* any officer so testified, which none did, such would have been the *sheer speculation* condemned in *Rauch* as insufficient for unlawful intrusion by police officers.

(4) The Court observes that there are lines of authority which distinguish circumstances where a warrant has issued, but is not served with the entry made to "secure the premises," as against circumstances where entries are made "to secure the premises" where no warrant has been issued but officers have gone to pick one up (much as householders stop by the grocery store to pick up a quart of milk or loaf of bread). The majority reasonably withholds its approval of those cases which make no distinction, but unreasonably fails to condemn totally warrantless entries made upon expectation that a magistrate will perform as expected—which is not always the case. The Court quite clearly leaves the impression that it will approve of entries made without *a warrant in existence* when the time comes. Although this would be consistent with today's holding, I strongly urge the Court to adopt the more constitutionally sound position of disapproving *all warrantless entries* which are made, regardless of when the warrant may be issued, and regardless of when it may be presented.

"Securing the Premises," another bit of nomenclature for that which is nothing but a warrantless entry, is a fallacious doctrine. It stretches the imagination beyond the breaking point to be told that the police, in this case three in number, can wander through a residence searching for "bodies," as one put it, and yet maintain with a straight face that they are not searching for anything else which their roving and searching eyes may see. Anytime an entry is made into a residence, access to which the police are not entitled, that constitutes a search. If the crime being investigated happened to be theft of pianos, an entry defended as a mere "securing of the premises" rather than a search for pianos will be thought by some to be beyond the bounds of credulity. Any entry made which gets the police within a residence where they are not otherwise welcome or invited is indeed a search, the extent of which is apparently only as limited as the officers' unbridled discretion allows. The taking apart of a residence board by board is not required to constitute a search made after entry. That which the Court fails to comprehend is the concept that the protections of the Fourth Amendment are not protections of property, but rather the protections of the people in their right to be secure within the confines of their own places of expected privacy—of which peoples' residences—their castles—are foremost.

As noted by the United States Supreme Court, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *Payton v. New York*, 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980), for "[f]reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." *Id.* at 588, 100 S.Ct. 1381 (quoting *Dorman v. United States*, 435 F.2d 385, 389 (D.C. Cir. 1969)). Thus the Supreme Court in *Payton* held that the sanctity of the home prohibits a warrantless arrest within the home. The Court reasoned as follows: "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590, 100 S.Ct. 1382.

Although that case involved a situation where no warrant had been issued, the principle remains the same—citizens have the right to know that the security and privacy

**824**

of their homes may not be violated by the state, and the police are not to enter those homes without the warrant which is their lawful badge of entrance. Totally monstrous is the proposition, advanced by the Court itself, that the conduct here complained of was a mere *"Securing the Premises,"* and hence not interdicted as would be an unlawful *searching the premises.* Keeping in mind that the Fourth Amendment is all that protects the people against unreasonable searches *and seizures,* accordingly, "Securing the Premises" must be recognized for what it in reality is, a securing of the occupants as well as the premises, and thus a seizure of those occupants and premises within the meaning and purpose of the Fourth Amendment.[4]

The only discernible difference between the intrusion of a "securing" from within as against a "search" is one of purpose; a search is to discover evidence to be taken for later use at trial, whereas in a mere "securing" the violated premises and occupants are seized and laid captive until the police officers arrive with the warrant which, by the doctrine espoused by the Court in today's opinion, is said to legitimatize the dastardly prior conduct. In today's sanctioning of "Securing the Premises" the police are given judicial license to at will invade any and all parts of a person's home, while at the same time the occupants (here a woman and child) are custodially restrained in their own living room. In fact and truth, "Securing the Premises" is by far the worst infringement on the Fourth Amendment which has yet been visited on the people. The police, without being able to show any authority for their intrusion, need only declare to the occupants of a house that they are "securing" it on the premise that such is sufficient justification for their entry. Such conduct is on a par and readily classified with the much hated General Warrant visited upon the colonists by the British, which abuse played a large part in fomenting the Revolution. Nor is it any defense to suggest that the people

ought not to complain because, after all, somewhere, although the warrant proving that fact is not present, there has been a determination of probable cause made by a detached and neutral magistrate. Only the presentation of a warrant at the time of the intrusive entry can be said to meet with constitutional requirements.

In a similar context, as to seizing the person, rather than his premises, I.C. § 19–609 requires that "[i]f the person making the arrest is acting under the authority of a warrant, *he must show the warrant,* if required." (Emphasis added.) An officer without a warrant in or at hand is not in a position to respond to a demand that he either display it or make an immediate retreat. The officer might very well be forced to engage in an affray, which in many instances will surely result.

In *Anderson v. Foster,* 73 Idaho 340, 252 P.2d 199 (1953), a more enlightened Court upheld a jury verdict finding a police officer guilty of false arrest where the evidence showed that the officer did not show the warrant or advise of his reason for making the arrest.

That the same principle requires a warrant before the police invade the sanctity of the home is also evident in the provisions for no-knock entries. Under these provisions, *notwithstanding that a warrant is in hand,* the police must still announce their presence, purpose and authority before entering someone's house, except in exigent circumstances. I.C. § 19–4409; *State v. Rauch,* 99 Idaho 586, 586 P.2d 671 (1978). This rule is based on four purposes or policies: (1) the protection of the privacy of the individual in his home; (2) the protection of · innocent persons who may also be present on the premises where an arrest is made; (3) the prevention of situations which are conducive to violent confrontations between the occupant and individuals who enter his home without proper notice; and (4) the protection of police who might be injured

---

4. *See State v. Hobson,* 95 Idaho 920, 523 P.2d 523 (1974), where this Court held that where the police stop and surround the occupant of

an automobile, they are "seizing" him within the meaning of the Fourth Amendment.

by a startled and fearful householder. *State v. Rauch*, 99 Idaho 586, 588–89, 586 P.2d 671, 673–74 (1978).

Securing the Premises is a new judicial doctrine totally destructive of civil and constitutional rights, and is better condemned than condoned. The police, without being able to display a proper warrant, simply cannot be allowed to roam the length and breadth of a private residence, occupying and opening all of its closets and rooms, and justify such action on the basis that a search warrant "is on its way." Such conduct is illegal, and the potential for violent confrontation is awesome. It must be remembered that there still are in our country many rugged individualists of Revolutionary War caliber who might not all so calmly yield to a voice asserting authority while making illegal entry on the verbal declaration of the existence of a warrant which may later arrive.

In addition to these policy justifications for requiring that the warrant be present before the police enter the premises, under basic Fourth Amendment analysis, which compares the degree and scope of the invasion of defendant's person or property with the objective and imperative of the government action, this particular "securing of the premises" was unreasonable.

Obviously, the scope of the invasion into defendant's property here is substantial. The necessity of the state's action, however, is not so obvious. The only reason now advanced for "securing the premises" in the present case was the prosecution's argument of bare surmise that someone *might* have seen Gomez's arrest, and sheer speculation that in turn someone *might* have called Gomez's wife, who *might* or might not be involved, and told her to destroy the drugs, *assuming* that she knew where the drugs were, and *might* so do. Just as such conjecture cannot support an entry without notice, *see, e. g., State v. Doering*, 384 F.Supp. 1307 (W.D.Mich.1974) (mere presence of drugs insufficient to justify immediate entry), so it cannot support an entry without a warrant. As stated in *Shuey v. Superior Court*, 20 Cal.App.3d 535, 106 Cal.

Rptr. 452, 455 (1973), such emergencies are "strictly of the 'do-it-yourself' variety." While it is recognized that exigent circumstances might exist in some cases such that an entry should necessarily be made before the arrival of the warrant, even without a warrant having issued at all, such is not this case. To hold, as the Court does, that entry made without a warrant in hand is permissible, when based on nothing more than the purported purpose of securing the premises, is a judicial outrage. To give judicial sanction to entries such as that made here completely negates the constitutional right of the people to be secure in their homes. It is an intolerable proposition—and coming from this Court is nothing short of chaotic.

Where the Court may take the people of this state within the orbiting doctrine of "Securing the Premises" is best exemplified by that which has taken place in Arizona, the most recent case being *State v. Broadfoot*, 115 Ariz. 537, 566 P.2d 685 (1977). Therein the Supreme Court of that state said this:

"Appellant also asserts that police conduct in securing appellant's house while procuring a warrant violated appellant's rights under the Fourth Amendment and requires suppression of items seized pursuant to that warrant. *To the contrary, the police in this situation did precisely what we continually exhort them to do.* The officers resisted the impulse to search the house immediately—conduct which would have violated appellant's Fourth Amendment rights. Instead they submitted the issue to a detached, impartial magistrate. A search warrant was properly procured. Under the circumstances, police could not be expected to leave the house unattended. *So long as there is no unreasonable delay in seeking and procuring a search warrant, securing the premises is not unreasonable police conduct. See State v. Cook*, 115 Ariz. 188, 564 P.2d 877 (1977); *State v. Smith*, 112 Ariz. 531, 544 P.2d 213 (1975)." 566 P.2d at 687 (emphasis added).

The only information in the opinion as to the type of premise-securing is this:

"The license plate number of the car the suspects left in was taken down by a witness. This led police to appellant's house, where the suspects had driven. Police detained four men outside the house, two of whom were identified by the clerk as the suspects. A warrant to search the house was sought and issued. *Appellant's house was secured until the warrant was issued, and no one, including appellant's wife, was permitted access.*" 566 P.2d at 680 (emphasis added).

The court did not presume to suggest what would have been the status of the entry (assuming there was one) if a warrant was not obtainable. In *State v. Smith*, 112 Ariz. 531, 544 P.2d 213 (1975), the residence in question was a house trailer (this was the Arizona case which the trial court here thought applicable). The "Securing of the Premises"—according to the opinion of the Arizona Supreme Court—was "by posting a police officer *on* the premises and not allowing any person or material to enter or leave the premises." 544 P.2d at 214 (emphasis added). Thereafter a warrant was obtained, and the officers "conducted a search *of* the premises." 544 P.2d *at 215 (emphasis added). I note also that the opinion mentioned that a "Mark Seger, who was *inside* the trailer, objected to the procedure and was placed under arrest . . . ." 544 P.2d at 215 (emphasis again supplied). It is totally unclear whether "on the premises" referred to the outside realty, or the residence itself, and as the later opinion demonstrates, this was not of particular significance to the Arizona court. The court there did intimate, as did Judge Norris in this case, that the premises were "illegally secured,"—but the court there seemed satisfied that such did not taint the search which took place thereafter:

"If the warrant was properly issued the search in response thereto was a proper search and seizure and *the fact that the premises may have been illegally secured does not operate to nullify the effect of the search warrant.* The fact that defendant or his friends were deprived of the opportunity to destroy the evidence while the officers went to obtain a search warrant does not make the warrant infirm as Justice Cole in his dissent stated:

"'It is stultifying to suggest that a causal link between illegal detention and seizure under the warrant exists because petitioner * * * was deprived of the opportunity to destroy the marijuana and amphetamines.' *Shuey v. Superior Court for County of Los Angeles*, 30 Cal.App.3d 535, 547, 106 Cal. Rptr. 452, 460, n.1 (1973).

"Also *we do not find the officers' actions herein in securing the premises were such that they should be disapproved by this court.*

"It may well be that had the facts been developed on this point that the officer, on the basis of exigent circumstances, would have had the right to search the premises without first obtaining a warrant. Instead he chose to secure the premises and seek out a magistrate for a warrant. The officers' actions were preferable to searching the premises without a warrant and complied with both the letter and the spirit of the law." 544 P.2d at 216 (emphasis added).

As carefully noted by the Arizona court which cited it, the above quote from *Shuey* is found *in the dissenting opinion* in that case. The majority in *Shuey* refused to sanction the "securing" of the premises by allowing it to provide probable cause for a subsequent warrant. Evidence seized pursuant to the otherwise valid warrant was therefore suppressed.

The idea that an illegal securing of the premises is somehow severable from a subsequent search pursuant to warrant is repugnant to the Constitution. The purpose of the exclusionary rule is to give meaning to the Fourth Amendment by deterring illegal police conduct. The conduct complained of here is an example of the worst possible abuse of state powers—armed undercover officers bursting into a private residence and combing the house while a woman and her child sit in stark, ignorant fear of the events that are swirling around them. If ever there was a need to deter the excesses

of the use of police power, such a need is here. As stated in *Shuey, supra* at 457, 106 Cal.Rptr. 452, "the police are to be encouraged to obtain warrants whenever possible, but the fact that they do so in a particular case does not retroactively purify preceding misconduct."

Several better-reasoned decisions follow *Shuey.* In *State v. Bean*, 89 Wash.2d 467, 572 P.2d 1102 (1978), the Washington court stated:

"In suppressing the evidence seized prior to the securing of a search warrant, the trial court necessarily found by implication that no sufficient exigent circumstances in this case justified the warrantless entry of the residence. We are in complete agreement with the trial court's statements, but we go further to hold that the trial court's failure to suppress evidence which was obtained from the house after the search warrant was served, was error. The initial entry into the house was wrongful and the subsequently obtained search warrant was not curative of the original illegal entry. *People v. Shuey*, 13 Cal.3d 835, 850, 120 Cal.Rptr. 83, 94, 533 P.2d 211, 222 (1975). In *Shuey* the California Supreme Court, upon being presented with this very issue, stated as follows:

Analytically this case can be regarded simply as involving a de facto, inchoate seizure of the person and property of Paul the moment the police began the illegal occupation. Thereafter the obtaining of the warrant could no more operate 'to disinfect this conduct' (30 Cal.App.3d 535, at p. 540, 160 Cal.Rptr. 452) than if the police had actually seized the individual items sought to be suppressed prior to acquisition of the warrant." 572 P.2d at 1105.

*See also United States v. Griffin*, 502 F.2d 959 (6th Cir. 1974); *State v. Matsen*, 287 Or. 581, 601 P.2d 784 (Or. 1979).

In *State v. Cook*, 115 Ariz. 188, 564 P.2d 877 (Ariz.1977), also cited in the *Broadfoot* excerpt, Justice Gordon for that court, as did Justice Donaldson for this Court in *Rauch*, wrote an excellent opinion on application of the Arizona knock-and-announce statute, holding that a warrantless entry made in order to arrest was violated by noncompliance with their statute. In so doing, he repeated an earlier truism:

"This statute embodies the time-tested mandate of the people of Arizona that the police respect their right to be left alone. In ruling on the announcement required by a similar statute, A.R.S. § 13–1446, we said: *'There is no more sacred right than to have the privacy of the home protected against unreasonable searches and seizures. An unexpected breaking into a home by officers might well result in their being killed under the impression that the home owner was protecting his family and his home against intruders.'* State v. Mendoza, 104 Ariz. 395 at 399, 454 P.2d 140 at 144 (1969). It is fundamental that 'knock and announce' statutes are adopted 'to safeguard officers, who might be mistaken, upon an unannounced intrusion into a home, for someone with no right to be there.' *Sabbath v. United States*, 391 U.S. 585 at 589, 88 S.Ct. 1755 at 1758, 20 L.Ed.2d 828 (1968).

"We note that there are no exceptions on the face of the statute, nor are we persuaded to create any." 564 P.2d at 881 (emphasis supplied) (footnote omitted).

Holding that there were no exigent circumstances, as was equally true in our *Rauch* case, the Arizona court said this about securing the premises:

"Our analysis must proceed one step further. Even if the entry into appellant's home could be justified, the physical evidence obtained therefrom would still be suppressed as the officers knew within seconds that the suspect was not there. At that point, the officers' duty was to secure the premises and obtain a search warrant. *See State v. Sauve*, [112 Ariz. 576, 544 P.2d 1091] *supra. If the police had been lawfully within appellant's home for a purpose other than to seize the items seen, the 'plain' or 'open view' doctrine would permit the seizure*

*and use in prosecution of items which inadvertently came into their view."* 564 P.2d at 883 (emphasis added).

It would seem that at one point in time, at least, the Arizona court did recognize that "Securing the Premises" did not include a physical intrusion into the residence—but that somewhere in transition that court forgot what the Fourth Amendment is all about. With reference to the last quoted excerpt, if "Securing the Premises"—meaning an intrusive and unwelcome entry—is a lawful entry, then that court was entirely correct in observing that it is for certain a search, at least to the extent of items which are in "plain" or "open view." If such open view items can be picked up, in "Securing the Premises," as that court agrees, then indeed there is a search. As stated in *Shuey, supra,* "[i]n practical effect, then, the officers 'seized' everything in the apartment, and detained [the defendant's] person, hoping that a search warrant would later permit them to particularize the seizure and to arrest [the defendant]." 106 Cal.Rptr. at 454.

In concluding this aspect of my views, I submit only the obvious. The Court's opinion exceeds the bounds to which it should have gone. And, as to the trial court's opinion that the warrant search was separable from the warrantless intrusive entry, I disagree, submitting that the only evidentiary reason given by Officer Johnson for breaking into the Gomez residence was his obedience to the order of a superior officer, one not on the scene.

## IV.

## PROBABLE CAUSE FOR THE SEARCH WARRANT

Compounding the monstrosity, the affidavit offered in support of the search warrant was insufficient to support a finding of probable cause. The analysis by the majority is correct insofar as it defines the issue as being "whether the criminal activity previously observed by the police officers, supported by the *Aguilar*-defective informant's tip, can support a magistrate's finding of probable cause." From there, how-

ever, the majority reaches too far in trying to uphold this warrant.

## A.

For a search warrant to be valid, the affidavit in support of the warrant must set forth the underlying *facts* which the affiant believes establish probable cause. *State v. Oropeza,* 97 Idaho 387, 545 P.2d 475 (1976). As stated by the United States Supreme Court, moreover, "[w]hile the statute does not fix the time within which proof of probable cause must be taken by the judge or commissioner, it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause *at that time." Sgro v. United States,* 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932) (emphasis added).

In order to determine whether the informant's tip in the present case is sufficient to elevate the prior police observation of criminal conduct to the level of a *current* finding of probable cause, it is first necessary to examine the sufficiency of the earlier observations by themselves. If these observations come close to establishing probable cause, then an imperfect tip can more easily supply the little bit more needed to show probable cause. If these observations do not come close to establishing probable cause, however, then more is required of the tip, and consequently, the tip must be examined more closely.

The factors to be considered in determining whether information is too stale to support a finding of probable cause are the passage of time, the type of criminal activity involved, the length of time during which the activity has continued and the nature of the property to be seized. *State v. Willey,* 363 A.2d 739 (Me.1976).

If these factors are considered one at a time in the present case, it is apparent that these prior observations alone fall far short of establishing current probable cause.

Although the passage of time by itself is not controlling, a lapse of thirty-nine days obviously mitigates against present proba-

ble cause in the absence of other circumstances. Such other circumstances, of course, would be the type of criminal activity involved and the length of time over which the activity occurred. Here there were two isolated drug sales made in a period of one week, followed by five weeks of no observations of any alleged criminal activity. There are no facts in the affidavit, in spite of the implication by the majority to the contrary, that this was a large-scale continuous drug operation. It is not readily seen that there is probable cause to believe that anyone twice seen selling drugs will have drugs in his house more than one month later, especially in light of the fourth consideration, namely that drugs are easily transported and disposed of.

As stated in *Ashley v. State*, 251 Ind. 359, 241 N.E.2d 264, 269 (1968):

"Although there can be no precise rule as to how much time may intervene between the obtaining of the facts and the issuance of the search warrant, in dealing with a substance like marihuana, which can be easily concealed and moved about, probable cause to believe that it was in a certain building on the third of the month is not probable cause to believe that it will be in the same building eight days later."

The same reasoning holds true for heroin and other drugs. Thus the court in *State v. Ingram*, 251 Or. 324, 445 P.2d 503 (1968), held that a purchase of heroin on January 9 was insufficient to support a finding of probable cause on February 6. "Heroin is easily disposable and transportable and its presence on January 9 would not afford any strong basis for believing that it was present on the premises a month later." *Id.* at 505.

Similarly, the affidavit in *State v. Spencer*, 9 Wash.App. 95, 510 P.2d 833 (1973), executed March 9, 1972, relied on sales of amphetamines by the defendant on December 23, 1971, and January 7, 1972. The court held that "[t]hese sales are too remote in point of time to constitute probable cause for the issuance of a search warrant on March 9, 1972." *Id.* at 834. *See Common-*

*wealth v. Novak*, 233 Pa.Super. 236, 335 A.2d 773 (1975) (a dozen purchases of drugs seven weeks ago insufficient to establish probable cause because it is likely that narcotics being held for sale will quickly be disposed of). As these cases indicate, two isolated sales do not raise an inference that the defendant was engaged in the continuing business of distributing narcotics, in spite of the unsupported assertion to the contrary by the majority. *See also Hemler v. Superior Court*, 44 Cal.3d 430, 118 Cal. Rptr. 564 (Cal.App.1975) (no such inference from one sale); *Ashley v. State*, 251 Ind. 359, 241 N.E.2d 264 (1968) (no such inference from one sale); *State v. Willey*, 363 A.2d 739 (Me. 1976) (no such inference from three sales); Anno., 100 A.L.R.2d 525, 542 (1965) ("where the affidavit includes facts showing that the activity is of a continuous nature . . . the courts are likely to find probable cause . . . where the affidavit recites an isolated violation . . . the courts may refuse to imply the existence of probable cause although· just a few days have passed").

The majority cites *Johnson v. State*, 14 Md.App. 721, 288 A.2d 622, cert. denied 409 U.S. 1039, 93 S.Ct. 517, 34 L.Ed.2d 487 (1972), for the proposition that *"[u]nder appropriate circumstances*, some courts have viewed drug trafficking as an inherently continuous activity." (Emphasis added). The majority fails to point out that the circumstance in that case was that the informant was in the defendant's car when he made his rounds to determine who was to be re-supplied with narcotics, thus implying a continuous business of selling narcotics. Similarly, in *State v. Black*, 36 Or.App. 613, 585 P.2d 44 (1978), the informant's observations of drugs at defendant's house at least once a week for eight months led to the overwhelming inference that the defendant had been and still was in the drug-selling business. There are no such facts in the affidavit before us; there is no indication that the sales involved large quantities, no indication of a large clientele, and no factual evidence of prolonged drug activity. Once it is acknowledged that two isolated observations alone do not create an infer-

ence of continuous activity, and that there are no other factual circumstances here to support such an inference, it is apparent that the officers' observations did not come close to establishing probable cause. Thus the informant's tip must be examined closely, for it must do far more than provide a minimal bit more to establish probable cause.

### B.

The issue thus becomes whether the following statement in the affidavit elevated these two police observations to the level of probable cause:[5]

"That on May 17, 1976, a City-County Narcotics and Major Crimes Division confidential informant assigned CCND Code # 78 advised your Affiant that CARLOS GOMEZ had delivered a quantity of heroin through a third party to two subjects from the Burley, Idaho, area; one of those subjects being a female by the name of JANIE RAMOS and another male subject known as PETE GUZMAN. That the confidential informant further stated that the said CARLOS GOMEZ *has in his custody a quantity of amphetamines*, more commonly known as crosstops or speed, and also a quantity of marihuana believed to be in excess of four (4) kilos." (Emphasis added.)

At the outset, I note, as does the majority, that these statements are totally conclusory, citing no facts as to how the informant came by this information.[6] As stated by the United States Supreme Court in holding that a conclusory affidavit was insufficient to support a finding of probable cause, "[f]or all that appears, the source here merely suspected, believed or concluded that there were narcotics in petitioner's possession. The magistrate here certainly could not judge for himself the persuasive-

ness of the facts relied on * * * to show probable cause. He necessarily accepted without question the informant's 'suspicion,' 'belief' or 'mere conclusion.'" *Aguilar v. State*, 378 U.S. 108, 113–14, 84 S.Ct. 1509, 1513, 12 L.Ed.2d 723 (1964) (footnotes omitted). Over fifty years ago, in *State v. Arregui*, 44 Idaho 43, 254 P. 788 (1927), this Court itself held that the affidavit must set forth *facts* to support a finding of probable cause. As we said in that case:

"He [the affiant] cannot leave at the foot of the mountain his load of facts, and with lightened and easy steps recite at the halfway station his conclusions as to facts which he does not choose to carry so far. The affiant's eyes, ears and other senses and powers are the mere instruments for securing and conveying to the magistrate the facts which these senses have observed or recorded, and his mind is not the place for the conclusion to be reached, but the mind and brain of the magistrate must form and draw the conclusions from facts.

"Affidavits which go no further than to allege conclusions of law or of fact are insufficient." *Id.* at 63–64, 254 P. at 794–95.

*See also Struve v. Wilcox*, 99 Idaho 205, 579 P.2d 1188 (1978), cert. denied 439 U.S. 1123, 99 S.Ct. 1037, 59 L.Ed.2d 84 (1979).

In deciding whether these conclusory statements, when added to the state police observations, can support a finding of probable cause, it would be well to remember our statement in *State v. Oropeza*, 97 Idaho 387, 392, 545 P.2d 745, 480 (1976):

"An affidavit must provide facts sufficient to create probable cause for the belief that the forbidden articles are within the place to be searched at the time the search warrant is requested.

---

**5.** I must point out that this is not a case where the tip generated police investigation so that the two combined produced probable cause, as in *United States v. Canieso*, 470 F.2d 1224 (2d Cir. 1972), quoted by the majority. Rather, this case involves an attempt to find probable cause by adding a totally conclusory informant's tip to unrelated stale police observations.

**6.** I must also point out that the two prior police observations alleged heroin sales, while the informant states that Gomez has other types of drugs in his house. I doubt that prior observation of heroin can support a statement that he now has other types of drugs in his home.

The sufficiency of proof necessary to create such probable cause may vary depending upon the facts of the case and the particular nature of the article(s) to be seized. In the instant case, dealing as we are with dangerous drugs, and the possibility of a search of a residence together with all persons and vehicles therein located, some particularity as to time must be made so as to enable the magistrate to make his determination of *present* probable cause for the issuance of the search warrant."

I cannot agree that these totally conclusory statements by the informant raise the affidavit above the floor of probable cause.

In *State v. Willey*, 363 A.2d 739 (Me. 1976), which I quote at length because of its remarkable similarity to the present case, the affidavit provided the following information on probable cause:

"On January 26, 1974 at approximately 6:00 p. m. this affiant ... [accompanied] by one Kenneth Allen Bowers hereinafter referred to as Boogie Bowers went by automobile to the above described premises owned and occupied by the said Malcolm (Mickey) Willey. Upon arrival this affiant gave Boogie Bowers $50.00 for the purchase of 2 ounces of marijuana. Boogie Bowers entered said premises and shortly returned from within with 2 ounces of marijuana, which marijuana has since been tested with positive results by the Department of Health and Welfare in Augusta. On January 28, 1974, this affiant repeated this process where Boogie Bowers entered said premises and returned with marijuana with similar test results. This process was repeated with like results yet again on February 2, 1974.

"On or about February 2, 1974 Boogie Bowers stated to this affiant that Mickey (Malcolm Willey) always has plenty of marijuana and was expecting a large shipment in a day or two. On other occasions Boogie Bowers has informed this affiant that Malcolm (Mickey) Willey always has grass on hand in said residence and never runs out.

"This affiant further states that he has every reason to believe Boogie Bowers and does in fact believe Boogie Bowers particularly in light of the three occasions stated above where Boogie Bowers said there was marijuana on the above described premises, entered said premises and in fact returned with marijuana from within." *Id.* at 741.

The court noted that the issue before it, in light of the delay of thirty-one days between the last purchase and the date of the application for the search warrant, was whether the affidavit "made a legally sufficient showing of the 'probable cause' constitutionally requisite to justify issuance of the warrant." *Id.* The court held as follows:

"Here, the affidavit states as *facts* of which the affiant Bridges had personal knowledge *only* that on three occasions during the eight day period January 26 to February 2, inclusive, Kenneth Bowers made three separate purchases of two ounces of marijuana at defendant's residence. *In light of the nature of marijuana as a substance which can be easily concealed and moved about and the relatively brief surveillance of defendant's residence during the period of forty-two days from the date of the first purchase to the time of the application for search warrant* (three brief incidents in a period of eleven days followed by thirty-one days of no surveillance whatever), we conclude that the three purchases at defendant's residence, as the only facts known to the affiant Bridges, are insufficient by themselves to justify the rationality of the conclusion by the magistrate that *thirty-one days after* the last such purchase had been made, there was still probable cause to believe that marijuana was present at defendant's home.

"*The question remaining, then, is whether there was anything else in the affidavit which, if taken as properly supplementing the facts within the personal knowledge of the affiant Bridges, would render the entirety of the affidavit a sufficient showing of the probable cause necessary* to justify issuance of the search warrant requested.

*"The only other matters in the affidavit ostensibly discharging this function are the representations by the affiant Bridges that,* more than thirty-one days prior to the application for the search warrant, *Kenneth Bowers had told Bridges that (1) Willey 'always has plenty of marijuana' and (2) Willey was 'expecting a large shipment in a day or two.'*

. . . . .

"This information from Bowers was purely hearsay as to the affiant Bridges. Yet, hearsay may assist in supporting a magistrate's finding of probable cause if (1) the hearsay provides *facts* to assist the magistrate in arriving at the independent judgment of the existence of the probable cause necessary to support issuance of a search warrant, and (2) the affidavit discloses facts showing that the source of the hearsay information is reliable. *State v. Gamage*, Me., 340 A.2d 1 (1975); *State v. Appleton* [Me., 297 A.2d 3633], supra; *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

"Here, we need not be concerned with the adequacy of the showing of the reliability of Bowers (as the source of hearsay information to the affiant Bridges) because we conclude that, in any event, the hearsay information itself failed to provide any facts, additional to the facts known to the affiant (the three prior purchases), which, taken in conjunction with the three prior purchases, would be adequate to show the requisite probable cause for issuance of a search warrant.

*"The affidavit of Bridges failed to reveal how Bowers was in a position to be able to say, as purported truth, that Willey 'always' has plenty of marijuana and 'was expecting a large shipment'* n a day or two. Such statements by Bowers are not themselves statements of known *facts,* i. e., of particular events or occurrences directly perceived by a person who thus 'knows' of them as 'facts.' Bowers' statements were, rather, statements of ultimate conclusions summarizing, or interpreting, the significance of other independent particular perceptions of individ-

ual events, or occurrences. These other underlying individual events, or occurrences, may, or may not, have been directly perceived by Bowers. It was necessary, therefore, at minimum, that the affidavit of Bridges should (1) state the nature of such other direct perceptions of particular events, or occurrences, on the basis of which the ultimate conclusions stated by Bowers had been reached, and (2) state whether such direct perceptions were those of Bowers or some other person who had told Bowers about them—in which latter situation it would be further requisite that the affidavit disclose facts showing the reliability of this other person as the source of hearsay information to Bowers (who in turn, had given the information, as hearsay, to the affiant, Bridges). *Because the Bridges affidavit contained none of this additionally necessary information, the magistrate lacked rational factual basis for an independent conclusion that there was probable cause to believe that marijuana would be present at defendant's residence when the requested search warrant was being applied for (or would be executed). State v. Hawkins,* Me., 261 A.2d 255 (1970)." 363 A.2d at 742–43 (emphasis added).

The court in *State v. Spencer*, 9 Wash. App. 95, 510 P.2d 833, 834 (1973) similarly held:

"The affidavit executed March 9, 1972 relies upon alleged sales of controlled substances made by the defendant on December 23, 1971 and January 7, 1972. These sales are too remote in point of time to constitute probable cause for the issuance of a search warrant on March 9, 1972. *United States v. Bailey* [9 Cir., 458 F.2d 408] *supra; Durham v. United States* [9 Cir., 403 F.2d 190] *supra.*

"The only other allegation offered in the affidavit to support the warrant is the officer's opinion that there were controlled substances stored on the premises to be searched. This opinion is not supported by any statement of fact. The mere expression of an officer's opinion, without more, cannot form the basis for

the issuance of a search warrant. *State v. Peterson*, 3 Wash.App. 946, 478 P.2d 745 (1970).

"For the foregoing reasons, the search warrant was not properly issued and the fruits of the search should have been suppressed."

*See also State v. Ingram*, 251 Or. 324, 445 P.2d 503 (1968) (sale of heroin twenty days prior to warrant plus allegation that defendant is a known narcotics user insufficient to support finding of probable cause).

In the present case, in addition to the two police observations, the affidavit contains an informant's tip which does not indicate whether the confidential informant observed the delivery firsthand, nor how it was known that the "third party" had acquired the heroin from Gomez. For all that is known, the confidential informant might have obtained his information from Ramos and Guzman, who in turn might have received their information from the "third party" who in turn might have received the drugs and information from Gomez himself. For all that is known, the informant, Ramos, and Guzman might never have met or talked to Gomez; they may simply have been relying on Gomez's reputation or on an underworld rumor. Not only does the affidavit raise the problematic aspects of hearsay, but also hearsay upon hearsay, and possibly hearsay upon hearsay upon hearsay. Such conclusory assertions in an affidavit are almost totally worthless due to their lack of supporting facts as to how the information was arrived at. They certainly cannot raise the two prior police observations to the level of probable cause.