123 P.3d 1254

**Donald L. WOODWARD, Petitioner–Appellant,**

v.

**STATE of Idaho, Respondent.**

No. 30295.

Court of Appeals of Idaho.

July 18, 2005.

Review Denied Nov. 22, 2005.

Nevin, Benjamin McKay, LLP, Boise, for appellant. Dennis A. Benjamin argued.

Hon. Lawrence G. Wasden, Attorney General; Ralph R. Blount, Deputy Attorney General, Boise, for respondent. Ralph R. Blount argued.

LANSING, Judge.

Donald L. Woodward appeals from the denial of his petition for post-conviction relief brought on the ground of ineffective assistance of counsel. Woodward contends that the district court erred in holding that Woodward's defense attorney provided competent representation when he advised Woodward to abandon a motion to suppress evidence and, instead, to accept the State's offer of a plea agreement. We affirm.

## I.

### BACKGROUND

Over a period of years, Idaho State Police detective Vernon Grotjohn periodically received information indicating that Woodward and his adult son, Jason Woodward, were engaged in growing and selling marijuana. In August 2000, after an individual who had been convicted of possession of marijuana told Grotjohn that Woodward and Jason were his suppliers, Grotjohn and other investigators conducted surveillance of Jason's property. That surveillance included the use of a thermal imaging device, which disclosed heat loss from a pole building near the residence. On August 18, Detective Grotjohn applied for warrants to search Woodward's and Jason's homes and associated buildings. The affidavit submitted in support of the warrant application detailed information that Detective Grotjohn had received concerning Woodward and Jason's alleged marijuana operations over a period of years and included the results of the thermal imaging. The requested warrants were issued and, as a consequence of evidence found in the ensuing searches, Woodward and Jason were charged with trafficking in marijuana.

Woodward and Jason hired an attorney to jointly represent them, waiving any potential conflict of interest. In May 2001, their counsel filed a motion to suppress evidence. The motion asserted that the affidavit supporting the search warrant application did not establish probable cause as it was based on stale information and information gained from unlawful thermal imaging. However, at the time set for hearing the motion, Woodward's attorney informed the court that the parties intended to vacate the hearing because plea agreements had been reached.

The plea agreement for Woodward provided that (1) the charge against him would be amended from trafficking in marijuana by possession of greater than 100 marijuana plants to trafficking in marijuana by possession of greater than 25 but less than 50 marijuana plants and, (2) that his sentence would be for two years determinate with eight years indeterminate. The agreement for Jason Woodward provided that (1) the charge against him would be amended from trafficking in marijuana by possession of greater than 100 marijuana plants to possession of marijuana with intent to deliver and, (2) that Jason would be placed on five years probation, serve sixty (60) days in the county jail, and be given a withheld judgment. Woodward and Jason were sentenced consistent with their respective plea agreements.

Woodward thereafter filed a petition for post-conviction relief. The petition alleged that Woodward's defense counsel had been ineffective in advising him that the suppression motion would be unsuccessful and/or in failing to properly pursue a motion to suppress physical evidence found at his and Jason's homes and additional evidence of growing marijuana to which Woodward led officers after his home was searched. Woodward also alleged that statements he made to law enforcement officials were the involuntary products of police coercion that could have been suppressed. According to the petition, Woodward pleaded guilty in order to obtain leniency for Jason, and if shared defense counsel had successfully pursued suppression of the evidence found at Jason's property, Woodward would not have pleaded guilty but would have insisted on going to trial.

The record is not entirely clear as to what evidence Woodward contends would have

been suppressed if his lawyer had properly pursued a suppression motion. There were, however, four groupings of evidence that could have been the subject of a suppression motion in the criminal case:

(1) physical evidence found at Jason's residence on execution of the search warrant (124 growing marijuana plants, grow rooms and growing materials);

(2) physical evidence found at Woodward's home on execution of the search warrant (less than three ounces of marijuana);

(3) statements made by Woodward during the execution of the search warrant on his home (admitting that Woodward financed the marijuana-growing operation at Jason's residence and that he and Jason were growing marijuana at four additional locations);

(4) evidence of four additional marijuana patches (total of 44 plants) to which Woodward led the police after the search of his home.

At the evidentiary hearing on Woodward's petition,[1] the attorney who represented Woodward and Jason in the criminal case acknowledged that, at the time he counseled them concerning the guilty pleas, he was not aware of recent decisions of the United States Supreme Court and this Court holding that the use of a thermal imaging device to discern activity within a building constitutes a search for which, in some circumstances, a warrant is required. *See Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001); *State v. Schumacher*, 136 Idaho 509, 37 P.3d 6 (Ct.App.2001). In closing argument at the conclusion of the hearing, Woodward's post-conviction counsel argued that, had defense counsel been aware of these authorities, he would have realized that the thermal imaging information had to be deleted in evaluating the sufficiency of the evidence presented in support of the application for the search warrants and that, absent the thermal imaging information, the remaining evidence presented in the warrant affidavit was insufficient to establish probable cause for a search of Jason's residence.[2]

The district court found, among other things, that even with the thermal imaging evidence excluded, the warrant affidavit established probable cause for issuance of the warrant on Jason's property. Therefore, the court concluded, Woodward did not demonstrate that his defense counsel was deficient for failing to pursue the suppression motion, and the court denied Woodward's petition for post-conviction relief in its entirety. Woodward appeals.

## II.

### ANALYSIS

■ One who applies for post-conviction relief bears the burden of proving, by a preponderance of the evidence, the allegations upon which his claim rests. Idaho Criminal Rule 57(c); *Clark v. State,* 92 Idaho 827, 830, 452 P.2d 54, 57 (1969); *Wilbanks v. State,* 126 Idaho 341, 345, 882 P.2d 996, 1000 (Ct.App.1994). Where the trial court has rendered findings of fact after an evidentiary hearing on an application for post-conviction relief, the findings will not be disturbed on appeal unless they are clearly erroneous. Idaho Rule of Civil Procedure 52(a). Findings will be deemed clearly erroneous only if they are unsupported by substantial and competent evidence in the record. *Whiteley v. State,* 131 Idaho 323, 326, 955 P.2d 1102, 1105 (1998); *Stuart v. State,* 127 Idaho 806, 813, 907 P.2d 783, 790 (1995); *State v. Thom-*

---

1. The State initially moved for summary dismissal of Woodward's petition for post-conviction relief, but the district court denied the motion and scheduled an evidentiary hearing. Nonetheless, at the close of the evidentiary hearing, the district court requested argument from the parties on the "Motion for Summary Dismissal." The district court apparently realized its misstatement, for in its order denying post-conviction relief it stated: "[I]n May 2003, the State filed motions for summary dismissal. The Court denied the State's motions and, by agreement of the parties, the matters were consolidated for

hearing." The foregoing is noted for the reason that Woodward's appellate briefs assert that this is an appeal from a summary dismissal. That is an incorrect characterization of the proceeding.

2. In closing argument, Woodward's post-conviction counsel conceded that the warrant application was sufficient to support the warrant on Woodward's home. Therefore, that portion of the abandoned suppression motion is not an issue on appeal.

*as,* 133 Idaho 682, 686, 991 P.2d 870, 874 (Ct.App.1999).

■ The standard for proving a claim of ineffective assistance of counsel was set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), where the Court identified two components that must be proved in order to prevail on such a claim:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

*Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. When the alleged ineffective assistance is an attorney's failure to file or pursue a motion to suppress evidence, the court must examine the probability of success of such a motion in order to determine whether counsel's decision against pressing the motion met objective standards of competence. *Huck v. State,* 124 Idaho 155, 158–59, 857 P.2d 634, 637–38 (Ct.App.1993). If the motion would have been denied because it lacked merit, then counsel would not be deficient, and the accused would not have been prejudiced, by a decision not to pursue the motion. *Id.* When the conviction is the result of a guilty plea rather than a trial, to prove prejudice "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203, 210 (1985).

**A. Whether Probable Cause for the Issuance of the Search Warrant Is Shown after the Illegally Obtained Thermal Imaging Evidence Is Excised**

■ Woodward contends that his defense attorney's advice was flawed because the attorney was unaware that the recent decisions in *Kyllo* and *Schumacher* required exclusion of the thermal imaging evidence from the warrant affidavit and, if the attorney had been knowledgeable about the rul-

ings, he would have realized that the remaining evidence in the warrant affidavit was insufficient to show probable cause for issuance of the warrants. The State does not contest Woodward's assertion that the thermal imaging evidence was unlawfully obtained and that the sufficiency of the warrant affidavit therefore must be judged without consideration of the thermal imaging information. The State argues, however, that even with that evidence excluded, probable cause is demonstrated.

■ If a search is conducted pursuant to a warrant, the burden of proof is on the defendant to show that the search was invalid. *State v. Carlson,* 134 Idaho 471, 475, 4 P.3d 1122, 1126 (Ct.App.2000); *State v. Wilson,* 130 Idaho 213, 215, 938 P.2d 1251, 1253 (Ct.App.1997); *State v. Kelly,* 106 Idaho 268, 275, 678 P.2d 60, 67 (Ct.App.1984). When determining whether probable cause for a warrant exists, the task is to make a "practical, commonsense decision" whether, given all the circumstances set forth in the affidavit, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983). *See also Wilson,* 130 Idaho at 215, 938 P.2d at 1253. The evidence offered in support of a warrant may include hearsay if there is a substantial basis for crediting the hearsay. *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684, 688 (1965); *State v. Wengren,* 126 Idaho 662, 666, 889 P.2d 96, 100 (Ct.App.1995).

In this case, Detective Grotjohn's warrant affidavit was lengthy and detailed. It described an ongoing investigation of many years' duration. The most significant of the information presented is summarized as follows.

In 1989, informant T.L.[3] told Detective Grotjohn that Woodward was active in growing marijuana plants in the Snake River and Salmon River drainages and had been doing so for a number of years. T.L. said that

---

**3.** In the warrant affidavit, informants were iden- tified by their full names.

Woodward used a jet boat to travel to locations where he would plant and maintain several grow operations at one time.

In the spring of 1991, Grotjohn observed a jet boat outside Woodward's residence in Genesee, Idaho, and two searches of Woodward's garbage turned up marijuana plant particles and residue. In August 1991, Oregon authorities charged Woodward and Jason with the manufacture and possession of marijuana and conspiracy to manufacture marijuana after they were apprehended with five pounds of marijuana while on Woodward's jet boat on the Snake River. At that time, Woodward admitted to Detective Grotjohn that he had grown the seized marijuana, and he led Idaho authorities to another active grow operation and seven former grow areas between Culdesac and Riggins, Idaho. Woodward pleaded guilty in Oregon and, in exchange for his cooperation, was not charged with any criminal offenses in Idaho.

In 1998, the Spokane office of the Drug Enforcement Administration informed Grotjohn that it was investigating a business suspected of supplying equipment used to grow marijuana, and that packages had been mailed from that business to Woodward. In September 1998, informant T.C. reported that Woodward's sister-in-law had said that Woodward was growing marijuana at a location near his home in Genesee and was selling it in the Boise area. In October 1998, Grotjohn conducted a garbage search at Woodward's residence, which resulted in a small amount of suspected marijuana stems.

In June 1999, informant N.K. said that two months earlier he purchased an ounce of marijuana from Woodward and that Woodward also agreed to trade one pound of marijuana for a stolen jet boat, telling N.K. that the marijuana would be delivered after Jason's 1,500 growing marijuana plants were harvested. Later, Woodward took N.K. to Jason's residence near Winchester to pick up one quarter-pound of the marijuana. There, Jason delivered a quarter-pound of marijuana to N.K. While on Jason's property, N.K. observed a number of marijuana plants growing outdoors, including several in the area where a pole building was under construction. Woodward told N.K. that he and Jason were growing about 1,500 living marijuana plants outdoors, scattered over a large area. Immediately prior to his conversation with Grotjohn, N.K. had been arrested on a burglary charge and marijuana had been seized. N.K. identified this marijuana as part of the quarter-pound that he had received from Woodward and Jason.

In July of 1999, informant R.G. told Grotjohn that Jason's father-in-law, John Watson, had introduced R.G. to "Don," who lived in Genesee. R.G. provided an accurate description of Woodward's vehicle and customized license plate. R.G. and Watson smoked some marijuana that Watson said he had obtained from Don. Watson told R.G. that Don said he was operating an indoor marijuana growing operation in a residence near McCall, Idaho.

In October 1999, an anonymous informant told another detective that a person named Steve Marcell, who lived near Winchester, was growing marijuana near his home. The informant said that Marcell had received his starter plants from "Don" in Genesee and provided an accurate description of Woodward's car and customized license plate. A search of the Marcell residence yielded marijuana. In December 1999, a search of Woodward's garbage revealed a handwritten note bearing the name of Steve Marcell's brother.

On August 1, 2000, Grotjohn interviewed Steve Marcell, who was serving a thirty-day jail sentence for possession of marijuana. Marcell said that he had been purchasing approximately one ounce of marijuana per week from Woodward and Jason for the past five years. Marcell said that on the day that his own residence was searched by authorities, Jason had brought a pound of marijuana and two guns into Marcell's residence and asked Marcell to hold them for safekeeping. Marcell said that this was the marijuana that was recovered in the search of his home. Marcell stated that he was providing this information to Grotjohn because Woodward was demanding $3,000 for the marijuana that was seized and Marcell was in fear for his safety because Woodward was violent and carried a gun. According to Marcell, during the previous winter he had observed thirty to forty marijuana starter plants growing in

Jason's residence and a number of larger growing and drying plants in another room. Marcell said that Jason had talked of building a shop on his property in the upcoming spring and summer for the purpose of growing marijuana indoors. Marcell asserted that Woodward was currently growing marijuana in Culdesac Canyon, near Winchester, and that he had personally observed Woodward's vehicle parked near the highway in that area several times in the spring and summer of 2000. Marcell also said that Jason and Woodward were partners in the marijuana growing and distribution business, that this was their primary source of income, and that Woodward had said that he made $40,000 in one year from his marijuana business. The next day, Marcell spoke to Grotjohn again. Marcell said that his wife had called to tell him that Woodward had just been to the Marcell residence and attempted to take their snowmobile in lieu of payment for the seized marijuana. Grotjohn thereafter spoke to ISP Trooper Youngren, who confirmed having seen Woodward's vehicle parked near the highway in Culdesac Canyon several times in the spring and early summer of 2000.

On August 10, 2000, Grotjohn conducted a garbage search at Woodward's residence and found marijuana stems and residue. That same day, Grotjohn and another detective surveilled Jason's property. They walked to the edge of Jason's property, where Grotjohn heard a humming noise consistent with an electric motor coming from a pole building on Jason's parcel. The motor turned on and off every few minutes. On August 15, 2000, Grotjohn and four other detectives went back to Jason's property in the early morning hours. One detective smelled what he believed to be growing marijuana. Again, an electric device was heard turning on and off at intervals. Three days later, Grotjohn applied for the search warrant.

Woodward argues that the foregoing information did not demonstrate probable cause to search Jason's residence and outbuildings for several reasons. First, he argues that much of the information is too stale to contribute to a finding of probable cause.

In *Carlson*, we discussed the factors to be considered in evaluating whether information offered in support of a warrant application is too stale:

> The staleness of information regarding the presence of items in a certain place depends upon the nature of the factual scenario involved. *State v. Turnbeaugh*, 110 Idaho 11, 13, 713 P.2d 447, 449 (Ct. App.1985). In a determination of whether information contained within a search warrant affidavit is stale, there exists no magical number of days within which information is fresh and after which the information becomes stale. The question must be resolved in light of the circumstances of each case. *State v. Gomez*, 101 Idaho 802, 808, 623 P.2d 110, 116 (1980). An important factor in a staleness analysis is the nature of the criminal conduct. If the affidavit recounts criminal activities of a protracted or continuous nature, a time delay in the sequence of events is of less significance. *Id.* Certain nefarious activities, such as narcotics trafficking, are continuing in nature and, as a result, are less likely to become stale even over an extended period of time. *See Turnbeaugh*, 110 Idaho at 14, 713 P.2d at 450.

*Carlson*, 134 Idaho at 477, 4 P.3d at 1129.

In the present case, much of the information presented in the warrant affidavit was several years old and, if viewed in isolation, would have to be considered too stale. However, the various elements and sources of information within a warrant application are not viewed in isolation, but collectively, to determine whether they constitute a showing of probable cause. When considered collectively, the information in Grotjohn's affidavit paints a picture of a longstanding enterprise, operated by Woodward and Jason, for the production and sale of marijuana. The most recently generated information indicated that the enterprise described by the older information was continuing up to three days before the warrant was requested. In this circumstance, the older information is appropriately considered, with due caution, in determining whether probable cause is shown. Moreover, even if all of the information generated before August 2000

(the month when the warrant was issued) were excluded from the affidavit, ample evidence remained to show probable cause for a search of Jason's property.

 Woodward next argues that N.K. and Marcell were not shown to be reliable informants. We disagree. In *Dunlap v. State*, 126 Idaho 901, 907, 894 P.2d 134, 140 (Ct.App.1995), this Court stated:

Where the person providing information is a "citizen informant," inclusion of his or her name and address in the warrant affidavit will, alone, be sufficient to show the informant's veracity and reliability. *State v. O'Bryan*, 96 Idaho 548, 552, 531 P.2d 1193, 1197 (1975). However, where the informant is part of the "criminal milieu" more information is necessary. *See State v. Villagran*, 294 Or. 404, 657 P.2d 1223, 1226–27 (1983); 1 Wayne R. LaFave and Joshua H. Israel, CRIMINAL PROCEDURE § 3.3(c), at 192 (1984). This further evidence of veracity and reliability may be provided by the informant's acknowledgement that he or she has participated in criminal activity.

Here, although both N.K. and Marcell were part of the "criminal milieu," their reliability was bolstered in that they incriminated themselves concerning marijuana transactions with Woodward and Jason. In addition, even information bearing little indicia of reliability may contribute to a finding of probable cause if it is corroborated by independent evidence. *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327, 332 (1959); *Carlson*, 134 Idaho at 476, 4 P.3d at 1127. Here, N.K.'s and Marcell's stories corroborate one another. Their information was also corroborated by police investigation, including observations made during the August 10 and August 15, 2000 surveillances of Jason's property.

Lastly, Woodward argues that some of the information in the warrant affidavit, such as the garbage searches at Woodward's home, has no nexus to Jason's residence. We conclude, however, that even if the evidence that was not directly implicating Jason is disregarded, ample evidence remains to establish probable cause for a search of Jason's property.

Because the warrant affidavit, after redacting the thermal imaging evidence, established probable cause for the search warrant of Jason's residence, the performance of Woodward's counsel was not deficient when he advised Woodward to abandon the suppression motion and accept the plea terms offered by the State.

**B. Whether Woodward's Statements Were Voluntary**

 Woodward also contends that statements he made to Detective Grotjohn during the warrant search of his home were coerced and involuntary, and that his later agreement to lead Grotjohn to four outdoor marijuana patches was obtained by exploitation of the involuntary statements. Consequently, according to Woodward, his defense counsel was ineffective for failing to pursue a motion to suppress this evidence.

 The use against a criminal defendant of a statement that the defendant made involuntarily violates the Due Process Clause. *Miller v. Fenton*, 474 U.S. 104, 109–10, 106 S.Ct. 445, 448–49, 88 L.Ed.2d 405, 410–11 (1985); *Haynes v. Washington*, 373 U.S. 503, 514–15, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513, 521–22 (1963); *State v. Doe*, 131 Idaho 709, 712, 963 P.2d 392, 395 (Ct.App. 1998). The exclusionary rule "applies to any confession that was the product of police coercion, either physical or psychological, or that was otherwise obtained by methods offensive to due process." *State v. Doe*, 130 Idaho 811, 814, 948 P.2d 166, 169 (Ct.App. 1997). In determining whether a statement was involuntary, the inquiry is whether the defendant's will was overborne by police coercion. *Arizona v. Fulminante*, 499 U.S. 279, 286, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302, 315–16 (1991); *Colorado v. Connelly*, 479 U.S. 157, 163–67, 107 S.Ct. 515, 519–22, 93 L.Ed.2d 473, 481–84 (1986); *Doe*, 131 Idaho at 713, 963 P.2d at 396; *State v. Davila*, 127 Idaho 888, 892, 908 P.2d 581, 585 (Ct.App. 1995). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167, 107

S.Ct. at 521, 93 L.Ed.2d at 484. "[T]he proper inquiry is to look to the totality of the circumstances and then ask whether the defendant's will was overborne." *Fulminante,* 499 U.S. at 287, 111 S.Ct. at 1252, 113 L.Ed.2d at 316; *State v. Troy,* 124 Idaho 211, 214, 858 P.2d 750, 753 (1993). These circumstances include:

1. Whether *Miranda* warnings were given;

2. The youth of the accused;

3. The accused's level of education or low intelligence;

4. The length of the detention;

5. The repeated and prolonged nature of the questioning; and

6. Deprivation of food or sleep.

*Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973); *Troy,* 124 Idaho at 214, 858 P.2d at 753.

▮ Preliminarily, we must address the State's assertion that Woodward's claim of coerced statements was not supported by evidence at the post-conviction hearing nor raised in closing argument by post-conviction counsel and therefore is not preserved for appeal. We cannot agree with the State's assertion. The record shows that this claim was pleaded and was argued in Woodward's prehearing briefs submitted to the district court, and Woodward did testify, in a general manner, regarding the alleged coercion. The State is correct, however, in noting that Woodward's counsel did not argue the claim at the close of the evidentiary hearing. It is perhaps for this reason that the district court's order denying post-conviction relief does not address it. Although the better practice would have been for Woodward to file a motion for reconsideration pointing out that this claim had not been considered in the district court's findings and conclusions, we will address it in this appeal because it can be decided as a matter of law on the record presented. For the purpose of analysis, we will assume as true Woodward's assertion that he was in custody after being placed in handcuffs during the search of his home, that he was not given *Miranda* warnings prior to questioning, and that Detective Grotjohn conducted questioning as alleged by Woodward.

▮ A *Miranda* violation, as distinguished from the coercion of an involuntary statement, does not result in the suppression of physical evidence discovered as a result of the unwarned statement. In other words, with regard to physical evidence later discovered, there is no such thing as "fruit of the poisonous *Miranda* violation." *See United States v. Patane,* 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). Therefore, the alleged *Miranda* violation would not have resulted in the suppression of evidence of other marijuana patches to which Woodward led law enforcement officers. A *Miranda* violation is a factor that is to be considered, however, in determining whether a statement was involuntary and hence a due process violation. *See Troy,* 124 Idaho at 214, 858 P.2d at 753. If involuntariness is found, then further evidence gained by exploitation of the involuntary statements would be subject to suppression. *Patane,* 542 U.S. at ——, 124 S.Ct. at 2628, 159 L.Ed.2d at ——; *Chavez v. Martinez,* 538 U.S. 760, 769, 123 S.Ct. 1994, 2002, 155 L.Ed.2d 984, 995 (2003).

In his verified petition, Woodward asserted that while handcuffed on the front lawn during the warrant search of his home, he was told by Detective Grotjohn that the contemporaneous search of Jason's residence had resulted in the discovery of an underground marijuana grow room in the pole building. He alleged that Grotjohn threatened that Jason and his wife would both be charged with crimes and that their daughters would be placed in foster care if Woodward did not reveal the location of his outside marijuana patches. Woodward alleged that he then admitted that he had financed the construction of and equipment for the pole building and underground grow room on Jason's property, and thereafter Woodward led Grotjohn to four other outdoor marijuana patches, resulting in the seizure of an additional forty-four marijuana plants. At his evidentiary hearing, Woodward testified concerning the coercion claim:

[Grotjohn] had come out of the—my home and grinning quite bigly, and he said, well, we finally found it. And then he started to

say that they had found the underground grow operation. And that my son was in a whole lot of trouble. And—and he proceeded to start questioning me more on—if I had any information to give the officers on any kind of bust. Also asked me if I had any outside grow operations going. And at that time I still hadn't said anything. He just kept pressuring me more and more.

. . . .

Well, he just kept pressuring me on what was going to happen to my son and his wife. There was a threat of me and my wife probably wouldn't see my grandkids again, or our grandkids again. At this point, my wife was in tears and I was—I was getting pretty upset also. Pretty scared. And finally after a couple times of that kind of questioning with them answers that he was giving me about my son and his wife and my grandkids, I said—I didn't have any information really on anyone else, but I could lead him to four outside marijuana grows.

We conclude that, as a matter of law, the evidence does not show that Woodward's statements to Detective Grotjohn were involuntary. The record contains nothing suggesting that Woodward was not of normal intelligence. He had prior experience with law enforcement officers, having previously been convicted of marijuana charges. The "interrogation" took place not at police headquarters, but on the front lawn of Woodward's home, and there was no deprivation of food or sleep. There was no showing of extended questioning. Instead, Woodward's testimony indicates that the questioning took place over the span of a few minutes.

■ Most importantly, Woodward has not shown that Detective Grotjohn's alleged interrogation was coercive. Although threats to prosecute a defendant's loved one when there is no legitimate basis to do so may be evidence of coercion, a confession "is not involuntary merely because it was motivated by the desire to prevent a good faith arrest of a loved one." *Schumacher,* 136 Idaho at 517, 37 P.3d at 14. Here, the police had a legitimate basis for arresting Jason and his wife, after having found a sophisticated marijuana cultivation operation in an underground room on their property. The prospect that Jason and his wife would both be arrested was a legitimate possibility, not a baseless contrivance devised only to coerce information from Woodward. The risk of possible adverse consequences for Woodward's grandchildren was caused by their family's criminal behavior, not by police misconduct. Therefore, Detective Grotjohn's alleged mention of this prospect was not impermissible.

In summary, even assuming Woodward's allegations to be true, the evidence is insufficient to show that his statements were the product of police coercion or other methods offensive to due process. Therefore, evidence of marijuana patches to which Woodward led law enforcement would not have been subject to suppression as fruit of coerced statements. It follows that Woodward's counsel was not deficient when he advised Woodward that the motion to suppress this evidence would probably not be successful.

### III.

### CONCLUSION

The district court did not err in holding Woodward failed to prove deficient performance by his defense counsel. The district court's order denying post-conviction relief is therefore affirmed.

Chief Judge PERRY and Judge Pro Tem WOOD concur.